FILED

1    THE GILLAM LAW FIRM
     *A Professional Law Corporation*
2    CAROL L. GILLAM, State Bar No. 102354          2008 MAR 24  PM 2: 42
     JOHN HAUBRICH, JR., State Bar No. 228341
3    1801 Century Park East, Suite 1560             CLERK U.S. DISTRICT COURT
     Los Angeles, California 90067                  CENTRAL DIST. OF CALIF.
4    Telephone: (310) 203-9977                          LOS ANGELES
     Facsimile: (310) 203-9922
5    carol@gillamlaw.com; john@gillamlaw.com        BY_____

6    Attorneys for Plaintiff Lou VanZant Carter

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA         **GW**

10   _____    CASE NO.: **CV08 - 01958**
     LOU VANZANT CARTER, an                                        **(SHx)**
11   individual,                          COMPLAINT FOR EMPLOYMENT
                                          DISCRIMINATION, HARASSMENT
12             Plaintiff,                 AND RETALIATION UNDER TITLE
                                          VII OF THE CIVIL RIGHTS ACT;
13        vs.                             VIOLATIONS OF FAMILY AND
                                          MEDICAL LEAVE ACT AND THE
14   CARLOS GUTIERREZ,                    AMERICANS WITH DISABILITIES
     SECRETARY OF COMMERCE,               ACT; INVASION OF PRIVACY
15   EARL ESTRADA, an individual;
     CHARLES SHERIDAN, an                 [42 U.S.C. § 2000e-5(f) *et seq.*;
16   individual, and DOES 1 through 10,   29 U.S.C. § 2911 *et seq.*; 42 U.S.C. §
                                          12101 *et seq.*]
17             Defendants.
                                          JURY TRIAL DEMANDED
18   _____

19

20

21        Plaintiff LOU VANZANT CARTER, demanding a jury trial, brings this

22   action against CARLOS GUTIERREZ, SECRETARY OF COMMERCE,

23   CHARLES SHERIDAN, and DOES 1 through 10, inclusive, for general,

24   compensatory and statutory damages, costs and attorneys' fees, and for declaratory

25   and injunctive relief, resulting from Defendants' unlawful and tortious conduct, and

26   as grounds therefor alleges as follows:

27   ////

28   ////

---

1

COMPLAINT FOR DAMAGES AND OTHER RELIEF

## JURISDICTION AND VENUE

1. This action arises under the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) *et seq.* as hereinafter more fully appears and is brought to redress the deprivation of Plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e) *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII") and her rights under the Family and Medical Leave Act, 29 U.S.C. Section 2911 *et seq;* and under the Americans with Disabilities Act, 42 U.S.C. Section 12101 *et seq.* Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1343(a)(4); 42 U.S.C. Section 2000e-5(f) and 28 U.S.C. Sections 2201 and 2202. This suit is authorized and instituted pursuant to Title VII and other federal statutes. The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by 42 U.S.C. Section 2000e *et seq.*

2. Venue is proper in the Central District .pursuant to 42 U.S.C. Section 2000e-5(f).

3. This lawsuit against a governmental agency is permitted under 42 U.S.C. § 2000e-16.

## ADMINISTRATIVE PROCEDURES/EXHAUSTION OF REMEDIES

4. Plaintiff has satisfied all of the procedural and administrative requirements necessary to bring this suit, and in particular, those set forth in Sections 706 and 717 of Title VII (42 U.S.C. Sections 2000e-5 and 2000e-16©) .

5. Plaintiff filed a timely written charge of discrimination, harassment and retaliation with the Office of Civil Rights, U.S. Department of Commerce. A final agency decision was mailed on or about February 20, 2008 and on or about March 14, 2008. Plaintiff has fully exhausted her administrative remedies before proceeding in this Court.

////
////

2

COMPLAINT FOR DAMAGES AND OTHER RELIEF

## PARTIES

6. Plaintiff Lou VanZant Carter ("Plaintiff" or "Ms. VanZant Carter") is and was at all times mentioned herein a citizen of the State of California residing is Los Angeles County and working in Orange County and elsewhere for the U.S. Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement ("OEE"). Plaintiff was a Special Agent (S/A) GS 1811-13-03 federal law enforcement officer at the time she was forced to resign from OEE.

7. Defendant Carols Gutierrez is the Secretary of the Department of Commerce. The Department of Commerce was at all times mentioned in this complaint operating in Los Angeles and Irvine, California. The Los Angeles Field Office of the OEE is located in Irvine, California.

8. Earl Estrada ("SAC Estrada") was at all times mentioned herein the Special Agent in Charge ("SAC") of the OEE's field office in Irvine, California. On information and belief SAC Estrada is no longer employed by OEE. SAC Estrada was Plaintiff's second line supervisor at times relevant to this complaint.

9. Defendant Charles Sheridan ("ASAC Sheridan") was at all times mentioned herein the Assistant Special Agent in Charge ("ASAC") of the OEE's Los Angeles Field Office. On information and belief S/A Sheridan is no longer an ASAC and has been demoted to special agent and relocated to OEE's New York office. S/A Sheridan was Plaintiff's first line supervisor at times relevant to this complaint.

## RELEVANT NON-PARTIES

10. At all times material to this complaint, the OEE was a governmental agency whose Los Angeles Field Office ("LAFO") is located at 2601 Main Street, Irvine, California 92714 in Orange County, California.

11. At all times material to this complaint, S/A Derrick Lee and S/A Carlos Olivo were special agents with OEE working in the Los Angeles Field Office.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

12.  Plaintiff worked as a Special Agent for the OEE and was employed by the OEE for approximately seven years.  She performed her job competently at all relevant times, receiving performance reviews of "outstanding" or "commendable" for most of her career and receiving cash awards regularly.  Plaintiff was stationed at OEE's LAFO at all relevant times.

13.  Upon information and belief and at all times relevant to this Complaint, the Department of Commerce was engaged in an industry affecting commerce that had more than fifty employees within 75 miles of OEE's LAFO for each working day in each of more than twenty calendar weeks in the calendar years involved in this Complaint.

14.  On or about May 1, 2006, ASAC Sheridan became Plaintiff's supervisor, although he was then stationed at the New York Field Office ("NYFO").  Plaintiff was surprised at his promotion to ASAC, as she knew from her years of working with OEE agents throughout the country of Sheridan's reputation as a hothead.  Prior to his relocating to the Irvine office, ASAC Sheridan frequently telephoned Plaintiff and asked her to provide him information about the whereabouts of other OEE employees in the LAFO, primarily about S/A Renee Bohrer, the only other female Special Agent in the office besides Plaintiff.

15.  On one occasion, Sheridan told Plaintiff that S/A Bohrer had requested annual leave and made derogatory comments about her leave request, calling her a "bitch."  Sheridan also said that S/A Bohrer should stay home with her baby and stated or implied that she should not work in law enforcement.

16.  ASAC Sheridan also made derogatory remarks about S/A Bohrer's shooting skills with her government-issued weapon, and claimed he and S/A Olivo were looking into removing her weapon.  Sheridan appeared to gloat about S/A Bohrer's alleged problems with weapons qualifications.

17.  ASAC Sheridan also made derogatory comments to Plaintiff about S/A

Elizabeth Blanche, the only female agent in the NYFO. He told Plaintiff that S/A Blanche did not know what she was doing and did not belong in law enforcement, and referred to her in terms like "bitch" and "slut."

18. In May or June 2006, ASAC Sheridan told Plaintiff that he did not like Chris Tereska, the LAFO Export Compliance Specialist, calling her "that bitch." He said Ms. Tereska had complained to SAC Estrada about receiving inappropriate treatment from Sheridan.

19. In May or June 2006, ASAC Sheridan spoke to Plaintiff in the LAFO, asking her whether the color or her bra always matched her pants or blouse, saying he noticed they always seemed to match. Plaintiff was shocked by this and could not understand how he knew about the color of her undergarments.

20. Defendant Sheridan told Plaintiff that he hoped she was no longer changing clothes in her office (a private office with a door) because they had placed video recording cameras throughout the office. Plaintiff felt extremely uncomfortable about Sheridan's comments but was fearful of saying anything. She was then unaware of any cameras having been placed in the office or of any authorization for management to observe her behind her office door by way of video surveillance. On information and belief, Defendant Estrada had the LAFO surreptitiously wired so that he could secretly conduct surveillance of the office from his home, via an undercover computer purchased with government funds. On information and belief both Defendants Sheridan and Estrada conducted surveillance of the interior of Plaintiff's office at times when she had a reasonable expectation of privacy therein, including when she was changing clothes behind closed doors.

21. Some time prior to June 21, 2006, Plaintiff informed ASAC Sheridan that she would not "spy" for him. Thereafter, ASAC Sheridan put increased pressure to Plaintiff and demanded more work from her than he had previously.

22. On June 21, 2006, at approximately 5:20 a.m., Plaintiff called ASAC

Sheridan, SAC Estrada and S/A Olivo to advise them that she was requesting sick leave because she did not feel well.  S/A Olivo was the duty agent that week.  Ms. VanZant Carter had become violently ill the night before and had been barely able to sleep due to her illness.  She was also unable to drive home due to her illness.

23.  ASAC Sheridan canceled Plaintiff's sick leave and ordered her to report to the office by 1 p.m. on June 21, 2006 notwithstanding her illness.

24.  ASAC Sheridan and SAC Estrada met with Plaintiff upon her arrival in the office.  They proceeded to ask Plaintiff extremely personal and embarrassing questions, as detailed below.

25.  SAC Estrada demanded to know where Ms. VanZant Carter had stayed the night before (June 20, 2006).  Plaintiff responded that she had stayed over at a friend's.  SAC Estrada demanded the name of the friend.  Plaintiff asked if she had to answer these questions.  SAC Estrada said she did.  Plaintiff responded that she had stayed at the home of Todd Carter (who was then her fiancé, and shortly thereafter became her husband).  Mr. Carter was and is a Special Agent with the Federal Bureau of Investigation ("FBI").

26.  ASAC Sheridan then demanded to know whether Plaintiff was sexually intimate with S/A Carter and whether she was in a relationship with him.  Plaintiff felt extremely uncomfortable at being asked such questions.  ASAC Sheridan demanded to know whether S/A Carter had taken sick leave that day.  SAC Estrada and ASAC Sheridan directed Plaintiff to provide the with a written statement that included identification of S/A Carter and the fact that their relationship was sexual in nature.  Plaintiff complied, noting in the statement that she understood "that a failure to comply could result in charge of insubordination and include a punishment up to and including removal."

27.  That same day (June 21, 2006), ASAC Sheridan had called Plaintiff's mother (whom Sheridan knew was ailing and recovering from cancer) and interrogated her about Plaintiff's whereabouts.  Plaintiff had not listed her mother as

COMPLAINT FOR DAMAGES AND OTHER RELIEF

1    her emergency contact because of her health and age.

2        28.   Later that same day, Plaintiff learned from her mother that an agent from

3    the LAFO had gone to her house to inquire of her whereabouts and that her mother

4    told the agent Plaintiff was not home.  Plaintiff's mother told her that S/A Sheridan

5    had also called her even though he already knew Plaintiff was not there.

6        29.   The following day, June 22, 2006, ASAC Sheridan went into Plaintiff's

7    office and yelled at her, "What the hell were you thinking getting involved with an

8    agent?"  Sheridan demanded to know whether Mr. Carter was married.  He told

9    Plaintiff that Mr. Carter better not be married or Carter and Plaintiff would be in

10   "big trouble" and Plaintiff would be fired.

11       30.   That same day, Sheridan confronted Plaintiff saying, "Lou, you are so

12   lucky he was not married because you would have been fired " (or words to that

13   effect).  He the raised his voice and said Plaintiff had previously been involved with

14   an agent who had who children and who "fu*ked you against the wall and now you

15   got involved with another agent who is going to fu*k you against the wall too and

16   leave your ass."  Plaintiff was extremely upset and completely humiliated by

17   Sheridan's remarks and tone of voice.  Under the guise of claiming Plaintiff had

18   misused her government-owned vehicle ("GOV") by parking it at S/A Carter's

19   home, Sheridan and SAC Estrada were engaging in extremely inappropriate conduct

20   by demanding the most intimate details of Plaintiff's personal life.  Plaintiff could

21   not help but cry.  In fact, Plaintiff behaved responsibly by parking her GOV instead

22   of driving it once she became extremely ill.  Furthermore, numerous male agents

23   used their GOVs for a variety of personal errands and were not disciplined or

24   questioned about intimate details of their personal lives.

25       31.   The following day, June 23, 2006, Sheridan told Plaintiff that SAC

26   Estrada was planning on contacting the FBI to find out about what type of leave S/A

27   Carter tool on June 21.  Sheridan proceeded to grill Plaintiff about whether S/A

28   Carter had also been sick and what type of leave he took.  Plaintiff responded that

he was not sick but was taking care of Plaintiff with her illness.

32. That same day, ASAC Sheridan told Plaintiff to prepare a travel authorization to travel to Washington D.C. on the holiday of July 4, 2006. Sheridan showed her flight information about the flight that would leave around 3 pm on the holiday. Plaintiff was not due to report to a meeting in Washington D.C. until the following day, July 5, 2006.

33. Plaintiff responded that she could not take that flight. Sheridan demanded to know, in a loud and threatening voice, why Plaintiff could not take the flight he suggested. Plaintiff responded that she had to care for her son. Sheridan then demanded, "What about your mother? Why can't she take care of him?" or words to that effect. Plaintiff responded that her mother had something to do that day, to which Sheridan yelled, "What could YOUR mother possibly have to do on the 4th of July?" Plaintiff explained that she mother was leaving somewhere with her brother. Again Plaintiff was deeply offended by Sheridan's remarks, attitude and tone of voice.

34. S/A Sheridan then told Plaintiff that she would personally have to explain to SAC Estrada that she could not take the proposed flight, which she did.

35. Plaintiff realized that Sheridan was not only trying to prevent her from having time with her family, but because he believed she could not handle the demands of the job as a female agent with a child. Plaintiff had learned that her attendance at the meeting in Washington D.C. was not mandatory, and informed ASAC Sheridan of this. Sheridan insisted she go anyway, even if over $1,000 in government funds would be expended.

36. Plaintiff discussed this incident with the only other female agent in the office, S/A Bohrer, who told her that she too felt that Sheridan was harder on the females in the office than the men, but was especially hostile and harsh with Plaintiff.

37. Plaintiff married Mr. Carter on June 28, 2006, and notified ASAC

1  Sheridan and SAC Estrada of her change in status a few days later.  She asked
2  whether she needed to take any other actions, but they never responded.
3       38.  On July 7, 2006, while Plaintiff was still in Washington D.C., SAC
4  Estrada emailed Plaintiff demanding to know the whereabouts of her time and
5  attendance sheet.  SAC Estrada well knew Plaintiff was in Washington without
6  access to email but was reachable on her cellular phone.  Later that day, Tereska
7  called Plaintiff to notify her that SAC Estrada instructed her (Tereska) not to pay
8  Plaintiff because her time and attendance information was not there.
9       39.  On July 10, 2006, ASAC Sheridan came into Plaintiff's office and began
10 asking her questions about her health insurance, life insurance and beneficiary, and
11 about whether Mr. Carter would be listing her as a beneficiary on his forms.  ASAC
12 Sheridan was not a Human Resources officer, and Plaintiff felt his questions were
13 intrusive and highly inappropriate.  Plaintiff also took the questions as a threat that
14 she had better be on her husband's plans because her job was about to end.
15      40.  The following day, July 11, 2006, ASAC Sheridan came to Plaintiff's
16 office and told her, "Your highness would like to see you."  Plaintiff was then made
17 to enter SAC Estrada's office, where a meeting was held behind closed doors.
18 ASAC Sheridan was also present.
19      41.  SAC Estrada told Plaintiff that she had been so secretive about her
20 marriage that it looked like she was doing things she was not supposed to do, and
21 that people were upset that she had not told them about her marriage.  Plaintiff
22 learned from other office staff later that they had not been upset, 36. only happy for
23 her.
24      42.  As the meeting proceeded, S/A Sheridan began to ask Plaintiff a
25 question, then said he would ask SAC Estrada if it was appropriate to ask this.
26 Sheridan then stated, "How long did you know him (her husband) for?  I thought
27 you said four months.  Marriage is a hard thing and it appeared that you did not
28 know him for a long time.  How long were you seeing him for sexually?  I hope you

did not get married just to improve your 'situation.'" SAC Estrada never stopped Sheridan from making statements or asking questions, and never said it was inappropriate.

43. Plaintiff then commented that the case she had been working on with her husband had been taken away from her, and asked if she would be able to work on cases with him in the future. SAC Estrada began to laugh uncontrollably and said, if she wanted to pose that question to the OEE director, she could do that, and then they'd write policy on the issue, saying it would be called the "Lou ODM (Office Directive Memorandum)."

44. On July 14, 2006, Plaintiff informed ASAC Sheridan that she would be commuting from home to San Diego for two days of firearms qualification, and asked if she would be paid her per diem for those days, since she would be driving 120 miles each way and would have long training days. Sheridan told her he would not authorize per diem. Plaintiff believed this was a discriminatory act and knew that male agents were allowed to receive per diem for similar circumstances.

45. On July 19, 2006, Plaintiff went to ASAC Sheridan's office to brief him on an undercover operation that had taken place the previous day. Sheridan began cursing at Plaintiff, using the "fu*k" word several times, and calling her a "fu*kin agent." Sheridan said that SAC Estrada believed that Plaintiff had participated in the undercover operation as a boondoggle to avoid attending a morning meeting in the LAFO. He further stated that SAX Estrada believed Plaintiff was lying about the undercover operation and that she wanted to stay at her home and not drive in to Irvine. He grilled Plaintiff about where her home was and why she was staying there. She explained it was because of her son, and that her mother helped care for him at home. Sheridan said he did not like Plaintiff stating that she was living in Los Angeles because of her son and yelled at her to lease the office before she "pissed him off" even more. Plaintiff left his office in tears.

46. As she left the office, Chris Tereska, whose office was directly across

from Sheridan's comforted her and said she was sorry that Sheridan had treated her so badly, and that she had overheard him curse at her. Tereska also said she had heard Sheridan yell at her other times in the past.

47. The following day, Plaintiff received an email from Sheridan dated the previous day, entitled "Leaving the Office." Sheridan stated in the email that Plaintiff now had to check with either Sheridan or SAC Estrada before leaving the office, and to inform them of "what is going on, where you will be, and what you are doing." No one else in the office had been placed on such a restriction.

48. On or about July 24, 2006, Plaintiff observed that ASAC Sheridan had been behind closed doors with S/A Lee and Olivo for an extended period of time. After that Sheridan came to Plaintiff's office and closed the door. He asked Plaintiff if she still wanted to work at the LAFO because she looked unhappy. Plaintiff said she was unhappy with the situation, and how she was being treated differently from the other employees, especially with having to check in with management each day when no one else was required to do so. She also noted that other agents were allowed to fuel their GOVs on their way to work while Sheridan had directed Plaintiff to do so on her own time during lunch. Since this was an official activity, Plaintiff said she should be able to do it during government time like others. She also told Sheridan that other agents were able to do their physical training ("PT") at the beginning or end of the day, but Plaintiff was not being allowed to do so.

49. Sheridan's response was to ask Plaintiff if she was planning on leaving, and whether Mr. Carter was going to take care of Plaintiff so she could be a stay-at-home mom. Sheridan continued by stating that if she were going to leave or get another job that was not in law enforcement, to do it before the new fiscal year, and then she would not have something in her personnel file that would follow her everywhere. Again Sheridan intimated that because she was female, she should not be in law enforcement. Sheridan also stated that criminal and administrative actions

1  were different, and that if Plaintiff left before any administrative action was taken,

2  then it would just go away as soon as Plaintiff stopped working there.

3      50. Plaintiff was alarmed at the suggestion of something criminal happening

4  to her, and asked Sheridan for clarification. ASAC Sheridan became visibly upset

5  and began to yell at Plaintiff, stating, "Fu*k...don't you fu*kin' understand are you

6  fu*kin' stupid." Plaintiff said she did not want him to curse at her anymore because

7  it made her very upset and it was unprofessional and harsh. Plaintiff further stated

8  that it was very difficult to work under current conditions as she was being singled

9  out and being asked not to do things all the other agents were allowed to do.

10  Sheridan then stated, "So that's what this is about."

11      51. That same day, July 24, 2006, Plaintiff heard a voice mail message on her

12  phone in the evening stating she had to call urgently about her situation at work.

13  That call was from a former OEE agent, Plaintiff's friend Patti Naughton. A short

14  time afterwards there was a call from S/A Lee from Plaintiff's office. Plaintiff

15  spoke to Ms. Naughton around 9:20 p.m. She warned me that something was going

16  to happen at work the next day with ASAC Sheridan, that S/A Lee had told her

17  (Naughton) that Sheridan was very upset because Plaintiff had mentioned a hostile

18  work environment and Sheridan thought Plaintiff was going to sue him. Naughton

19  explained to Plaintiff that S/A Lee had spent 1 ½ hours on the phone with her. She

20  related to Plaintiff that Sheridan was thinking of telling SAC Estrada that Plaintiff

21  was thinking on suing Sheridan, and that that if he told Estrada this, Estrada would

22  take Sheridan's recommendation to start proceedings to terminate Plaintiff.

23  Naughton asked Plaintiff not to divulge their conversation, but stated it was

24  important that Sheridan and Plaintiff "make up and be friends" in the morning

25  before SAC Estrada arrived at the office.

26      52. The next morning, July 25, 2006, around 8:30 a.m., Plaintiff went to

27  Sheridan's office to talk to him. S/A Lee came in and insisted that Plaintiff talk to

28  him first, before speaking to Sheridan. S/A Lee took Plaintiff downstairs and had a

12

COMPLAINT FOR DAMAGES AND OTHER RELIEF

1   tow hour conversation with her.  He started by saying what he was about to tell

2   Plaintiff "never took place" because he had a family he had to care for and he would

3   do anything to protect the well-being of his family.  Lee said that Sheridan could not

4   say certain things to Plaintiff because he was management, that Plaintiff needed to

5   show remorse and then she would only get a five or ten day suspension.  Plaintiff

6   said she had not been told anything about such disciplinary action.  Lee said the

7   reason she had not heard about this is because management could not tell her these

8   things because they were management.

9       53.  S/A Lee continued the conversation with Plaintiff, telling her that if she

10  did not accept the terms then Estrada would try to fire Plaintiff.  He also said that if

11  Plaintiff took action against them, she would be fired for sure.  Lee also said that

12  Sheridan would be demoted since he was still on probation, and that nothing would

13  happen to SAC Estrada.  Lee also said Plaintiff should quit and be a stay-at-home

14  mom and then everything would be okay.  S/A Lee also told Plaintiff that Sheridan

15  had given Lee more time to complete an assignment so he could talk to Plaintiff that

16  morning.  Lee further stated that Sheridan had become very upset at Plaintiff's

17  marriage.  Lee also told Plaintiff she should be able to figure this out on her own.

18      54.  Later that same morning, July 25, 2006, S/A Olivo came into Plaintiff's

19  office, having just spent time behind closed doors in Sheridan's office with S/As

20  Lee and Sheridan.  Olivo said he wanted to talk with Plaintiff outside the office

21  about her work situation. Olivo said he could help Plaintiff out, but not if she was

22  going to sue Sheridan, as he would not be a witness to a harsh environment.  Olivo

23  told Plaintiff that Sheridan had said he believed Plaintiff was planning to sue him,

24  based on the conversation of the previous day.  He further stated that ASAC

25  Sheridan had told both Olivo and Lee that Plaintiff had stated the foundation for a

26  hostile work environment, because Plaintiff had told Sheridan the environment was

27  harsh, she was being treated differently from others, Sheridan had cursed on several

28  occasions at her, and management had behaved inappropriately.

55. As the conversation continued, Olivo said Sheridan was paranoid and told Olivo he wanted a letter from Plaintiff stating that she would not sue him. Olivo asked Plaintiff if she was willing to write a letter that would allow Sheridan to be exonerated from his actions. S/A Olivo stated that a suspension of ten days had already been authorized but that if Plaintiff sued, Estrada and Sheridan would terminate her. He proceeded to tell Plaintiff that Sheridan would tell Estrada about his fear of a lawsuit and then Estrada would recommend termination. Just as Sheridan had the day before, Olivo said that if Plaintiff wanted to leave, she should do so before any action occurred so it would not be part of her personnel file. Otherwise, he said, the action would follow Plaintiff and destroy her career. Olivo told Plaintiff she should consider writing the letter.

56. Plaintiff was very upset that Sheridan was discussing her personal and work-related issues with subordinates such a S/A Lee and S/A Olivo. She felt very threatened by management's use of subordinates to coerce Plaintiff to write a letter by threatening to fire her if she did not.

57. The following day, on or about July 26, 2006, SAC Estrada sent Plaintiff an email terminating her participation in a program that had allowed her to schedule her core hours to be from 7 a.m. to 3:30 p.m.

58. The next day, July 27, 2006, S/A Olivo came to Plaintiff's office and appeared very upset, asking Plaintiff if she had thought about their conversation . Plaintiff asked Olivo if he meant her writing a statement that she would not sue Sheridan, and he said yes. Olivo said it would be beneficial for everyone involved if Plaintiff signed the statement that she would not sue. Plaintiff said she would not write up anything but that if they wanted her to sign something she would have a union attorney look at it. Olivo appeared very upset, and said he did not want to be involved in this and was already in too deep. Olivo further stated that S/A Lee was supposed to ask Plaintiff to write the statement but felt uncomfortable asking her to do so. Olivo also stated that he could understand why Sheridan was upset, and

14

COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  asked Plaintiff how she could do this to him, that she was "hurting Charlie."

2      59.  Plaintiff responded to Olivo that she was getting upset and would talk to

3  SAC Estrada and ASAC Sheridan and have them write whatever statement they

4  wanted, and that she would present it to an attorney for review.  Olivo then said

5  Sheridan would have to resign and it would be pretty bad for Plaintiff because

6  management would have to proceed to terminate Plaintiff.  Ms. VanZant Carter

7  responded that it was very upsetting that subordinates such as Olivo and Lee knew

8  more about Plaintiff's personal work issues than she did.

9      60.  The following day, July 28, 2006, Plaintiff went to ASAC Sheridan's

10  office to speak with him.  She stated that she wanted to know what was going on

11  because people kept coming to her asking her to write something stating she would

12  not sue him.  Sheridan responded that he had told Olivo and Lee not to get involved,

13  but they had done so because they were friends of Plaintiff (Plaintiff had not

14  mentioned Olivo or Lee by name).  Sheridan said he learned Plaintiff was planning

15  to sue him from Lee.  ASAC Sheridan further stated he was Plaintiff's friend and

16  did not want her to lose her hob.  He also said that Olivo and Lee had mis-

17  communicated what they wanted to tell Plaintiff.  Sheridan said, "That it was a

18  statement from me stating that I would not be suing him and that there was not a

19  hostile work environment."  Plaintiff asked if she were going to get something in

20  writing from him or SAC Estrada about the requirement that she report her daily

21  whereabouts.  Plaintiff also told Sheridan she was very upset with what was going

22  on in the workplace because she was being treated unfairly.

23      61.  Plaintiff was out of the office for the following two weeks, one on

24  business in Washington D.C. testifying before a grand jury, and the second on

25  previously approved annual leave.

26      62.  On her first day back in the office, August 14, 2006, ASAC Sheridan

27  came into her office and directed her to go on three assignments directly from the

28  office.  There were other agents in the office, all male, but he directed Plaintiff to do

---
15

COMPLAINT FOR DAMAGES AND OTHER RELIEF

all three assignments, which entailed her driving over 150 miles that day without receiving per diem.  Sheridan also told her he was canceling Plaintiff's pre-approved sick leave for August 16 and sending her to Las Vegas as well as to Arizona in the same day.  Plaintiff explained it would be impossible to do both states in one day.  Plaintiff also said this would leave her exhausted for her scheduled firearms training the next two days.  Plaintiff was still required to go to Las Vegas for two assignments, driving almost 600 miles without receiving per diem.

63.  The following day, August 15, Plaintiff was scheduled to participate in a search warrant in Newhall, California.  The participating male agents were authorized to stay the night before the search at a hotel and receive per diem.  Plaintiff was not allowed to do so.  Furthermore, Sheridan told her that as soon as she completed the search warrant, she was to drive to Camarillo and complete another assignment, for a total of 180 driving hours that day.

64.  After completing the Las Vegas trip the day before, Plaintiff called in on August 17 and informed ASAC Sheridan she could not drive to work due to eye problems.  Her eye had been twitching, burning and watering, and was red, burning and puffy, causing blurred vision.  The condition continued the following day and Plaintiff again informed ASAC Sheridan of her need for sick leave.

65.  On Plaintiff's next day at work, August 21, 2006, she was assigned to drive to Camarillo, then to Agoura Hills, then to Torrance, for a total of over 160 hours without receiving per diem pay.  On information and belief, no male agent in the office was receiving multiple driving assignments in a single day as Plaintiff was during this time.

66.  The next day, August 22, Plaintiff received a memorandum from ASAC Sheridan regarding a "Notice of Proposed Suspension" and an attached "Resolution Agreement."  Under the "Resolution Agreement" Plaintiff would waive her rights to file an EEO complaint against the agency, its employees and agents in their official

and/or personal capacities.  Plaintiff had never heard of anyone in the OEE office being suspended before.   Male agents had committed egregious acts like drinking on the job or had severe performance deficiencies such as being unable to write English above a second grade level, and they had not been suspended.

67.   The following day, August 23, 2006, Plaintiff succumbed to the pressure.  She emailed SAC Estrada and ASAC Sheridan to inform them she would resign.  Plaintiff was unable to sleep; she was being required to work long hours and drive long distances on a daily basis; and her health was being adversely affected.  In addition to the eye problems, Plaintiff was experiencing chest pains, fast heart palpitations, shortness of breath, chronic headaches, nausea, shaky hands, and back should and neck pain.  Her face was breaking out.  Plaintiff had trouble thinking clearly and could not concentrate.  Plaintiff's conditions constituted a disability within the meaning of the Americans with Disabilities Act, and were known to management.  Management had not told Plaintiff when, or even if, the special reporting restrictions imposed only on her would ever end.  Plaintiff was fearful from the threats to her career and the warnings to resign before the fiscal year ended to avoid having something in her file that would follow her wherever she tried to work later.  Once Plaintiff received the suspension notice and resolution agreement, she knew the situation was hopeless and she had no recourse but to resign.

68.   Plaintiff continued to suffer harassment after giving notice of her intent to resign.  She worked through the night Saturday, August 26 on an approved assignment but did not receive overtime pay, night differential or a compensatory day.

69.   On August 28, 2006, Plaintiff called in sick, having not slept all night due to the operation described above.  Plaintiff received a call from Chris Tereska, stating that SAC Estrada had instructed her to try to convince Plaintiff not to quit, but to consider leave without pay instead.

70.   That same day, Plaintiff reported an illegal search she observed being

17<br>COMPLAINT FOR DAMAGES AND OTHER RELIEF

1   conducted by ASAC Sheridan a few days earlier to the Office of the Inspector

2   General of the Department of Commerce ("OIG").  She informed another agent (S/A

3   Richard Weir) of having done so, and he asked if they should communicate the fact

4   of the illegal search to the Assistant United States Attorney ("AUSA") assigned to

5   the case as well.  S/A Weir said he feared retaliation from management if they told

6   the AUSA.  Plaintiff told S/A Weir to inform management of the fact that she had

7   notified the OIG's office and that they would be informing the AUSA.

8        71.  Immediately after S/A Weir informed  SAC Estrada of these facts, S/A

9   Weir came to Plaintiff and said Estrada had ordered him to seize Plaintiff's case

10  files and leads immediately, and to tell Plaintiff not to shred or destroy anything.

11  S/A Olivo was called out of the field and instructed to collect whatever property

12  Plaintiff had in her possession.  Olivo refused to take Plaintiff's government-issued

13  weapon, so Plaintiff told him she would leave it in her office, unloaded, secured

14  inside her office.  On information and belief, A/S Weir is now an ASAC.

15       72.  Plaintiff called SAC Estrada, who was in Chicago on training with ASAC

16  Sheridan, and asked him why he had taken away her files.  Plaintiff explained she

17  had wanted to put them in order before her final day the following week.

18       73.  The following morning Plaintiff came to work and saw her office had

19  been disturbed.  S/A Steven Huerta told her that he and S/A Lee had been called in

20  to check her office to see if anything was missing.  Huerta told Plaintiff this was not

21  right and that Plaintiff was being treated like a criminal.

22       74.  Plaintiff attempted to log in to her government email account and other

23  databases and the systems did not recognize her, even though she was still

24  employed and had appropriate security clearances and her resignation was not to

25  take effect until the following week.

26       75.  Later that morning, ASAC Sheridan told Plaintiff, by a conference call,

27  that she had to produce a doctor's note for sick leave or else it would be charged to

28  annual leave.  He gave no reason for this.  Plaintiff learned later that day that SAC

18

COMPLAINT FOR DAMAGES AND OTHER RELIEF

Estrada had called Tereska and told her to charge Plaintiff's sick days to annual leave. Plaintiff did obtain a doctor's note and had it faxed to Tereska.

76. Plaintiff was never informed of her right to file an EEO complaint, had no access to an EEO Counselor, and knew of no way to attempt to resolve her issues with management. Her situation had become hopeless. Plaintiff would not have resigned but for the hostile, discriminatory and retaliatory work environment she had experienced.

77. Plaintiff observed that SAC Estrada only hired male agents during her tenure even though qualified female agents had applied for jobs. On information and belief, since Plaintiff was forced to resign, OEE has not hired any female agents in the LAFO. On information and belief, there are currently no female agents in the LAFO, as S/A Bohrer has become an analyst instead of a special agent. On information and belief, Chris Tereska also filed an EEO complaint against ASAC Sheridan for gender discrimination. On information and belief the LAFO has had no fewer than four EEO complaints filed in the past few years. On information and belief OEE has taken no steps to remedy pervasive discrimination and harassment occurring in the file offices including the LAFO.

78. In May or June 2006, an office presentation was held in which two male agents received 10 year government plaques. Plaintiff did not, even though she had completed 10 years of government service at the time of the presentation. Plaintiff inquired about this matter several times while she worked there. Only months after she was forced to quit did Plaintiff finally receive her plaque and pin, with no letter or note attached. They were sent by SAC Estrada.

79. As a result of all of the foregoing, Plaintiff sought psychological counseling throughout the periods described above. She has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and

19

COMPLAINT FOR DAMAGES AND OTHER RELIEF

Plaintiff has suffered and continued to suffer a loss of earnings and other employment benefits.  Plaintiff has also had to retain legal counsel to address the violations of her civil rights as described hereinabove.

## FIRST CAUSE OF ACTION

**(Gender Discrimination – Against Defendant Gutierrez and Does 1-10)**

80.    The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

81.  At all relevant times herein and in violation of 42 U.S.C. § 2000e-2(a) *et seq.*, Plaintiff was a member of a protected class who performed her job satisfactorily and defendants and each of them, and/or their agents/employees, discriminated against Plaintiff because of her gender in employment decisions. Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and received a final agency decision.

82.  The conditions described above constituted a hostile work environment on the basis of Plaintiff's gender.  The harassment she experienced was severe and pervasive and altered the terms and conditions of her employment.  The conditions were so intolerable that a reasonable person in Plaintiff's position would have been compelled to resign.

83.  As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

84.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby

20

COMPLAINT FOR DAMAGES AND OTHER RELIEF

entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION
### (Retaliation – Against Defendant Gutierrez and Does 1-10)

85.   The allegations set forth in Paragraphs 1 through 80 above are realleged and incorporated herein by reference.

86.   At all relevant times herein and in violation of 42 U.S.C. § 2000e-3(a) *et seq.*, defendants and each of them, and/or their agents/employees, retaliated against Plaintiff by adversely affecting Plaintiff's employment and retaliating against her after she complained to management about disparate treatment, declined to sign a letter promising not to sue ASAC Sheridan, reported ASAC Sheridan's unlawful conduct to the OIG, and otherwise engaged in protected activity. Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and received a final agency decision.

87.   As a proximate result of defendants' willful, knowing, and intentional retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

88.   As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits. Plaintiff is thereby entitled to general and  compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

////

////

COMPLAINT FOR DAMAGES AND OTHER RELIEF

### THIRD CAUSE OF ACTION

### (Violation of 29 U.S.C. §2611 *et. seq* - Family Medical Leave Act-
### Denial of Leave– Against Defendant Gutierrez and Does 1-10)

89.   The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

90.   At all relevant times herein and in violation of 29 U.S.C. § 2611 *et seq.*, defendant was a covered employer and Plaintiff was an eligible employee who had worked for the OEE for more than 12 months and had worked at least 1,250 hours during the relevant 12 months period prior to the Family Medical Leave Act ("FMLA") violation.

91.   Plaintiff experienced serious medical conditions on the days she sought to take and/or took FMLA leave as described hereinabove.

92.   Defendant interfered with and denied Plaintiff's exercise of her FMLA rights and discriminated and retaliated against Plaintiff because of her use of FMLA leave.

93.   As a proximate result of defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

94.   As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and  compensatory damages in amounts as prayed below and to be proven at trial.  Wherefore Plaintiff prays for relief as set forth below.

////

////

COMPLAINT FOR DAMAGES AND OTHER RELIEF

# FOURTH CAUSE OF ACTION

## (Violation of 29 U.S.C. §2611 *et. seq* - Family Medical Leave Act-Retaliation – Against Defendant Gutierrez and Does 1-10)

95.    The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

96.    At all relevant times herein and in violation of 29 U.S.C. § 2611 *et seq.*, defendant was a covered employer and Plaintiff was an eligible employee who had worked for the OEE for more than 12 months and had worked at least 1,250 hours during the relevant 12 months period prior to the Family Medical Leave Act ("FMLA") violation.

97.    Defendant discriminated and retaliated against Plaintiff because of her use, and attempted use, of FMLA leave.

98.    As a proximate result of defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

99.    As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and  compensatory damages in amounts as prayed below and to be proven at trial.  Wherefore Plaintiff prays for relief as set forth below.

# FIFTH CAUSE OF ACTION

## (Violation of 42 U.S.C. §12101 *et. seq* -Americans With Disabilities Act -Disability Discrimination – Against Defendant Gutierrez and Does 1-10)

100.    The allegations set forth in Paragraphs 1 through 79 above are

COMPLAINT FOR DAMAGES AND OTHER RELIEF

realleged and incorporated herein by reference.

101. At relevant times herein and in violation of 42 U.S.C. § 12101 *et seq.*, Plaintiff was a disabled person who was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation. Plaintiff's disabilities substantially limited her ability to drive, walk and shoot a weapon. Defendants and each of them, and/or their agents/employees, discriminated against Plaintiff because of her disabilities and/or because of her perceived disabilities. Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and received a final agency decision.

102. As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

103. As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

**(Violation of 42 U.S.C. §12101 *et. seq* -Americans With Disabilities Act -**
**Failure to Accommodate - Against Defendant Gutierrez and Does 1-10)**

104. The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

105. At all relevant times herein and in violation of 42 U.S.C. § 12101 *et seq.*, Plaintiff was a disabled person who was otherwise qualified to perform the

<hr>

24
COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  essential functions of her job with or without reasonable accommodation.
2  Defendants and each of them, and/or their agents/employees, refused to
3  accommodate Plaintiff as required by law.

4       106.  As a proximate result of defendants' willful, knowing, and intentional
5  discrimination against Plaintiff, Plaintiff has sustained and continues to sustain
6  substantial losses in earnings and other employment benefits.

7       107.  As a direct and proximate result of defendants' unlawful conduct,
8  Plaintiff has sustained and continues to sustain physical injuries, pain and suffering,
9  and extreme and severe mental anguish and emotional distress; Plaintiff has
10  incurred and will continue to incur medical expenses for treatment, and for
11  incidental medical expenses; and Plaintiff has suffered and continued to suffer a
12  loss of earnings, pension and other employment benefits.  Plaintiff is thereby
13  entitled to general and compensatory damages in amounts as prayed below and to be
    ... at trial.  Wherefore Plaintiff prays for relief as set forth below.

15

16                      **SEVENTH CAUSE OF ACTION**
17     **(Violation of 42 U.S.C. §12101 *et. seq* -Americans With Disabilities Act -**
18     **Failure to Engage in Interactive Process - Against Defendant Gutierrez and**
19                              **Does 1-10)**

20       108.   The allegations set forth in Paragraphs 1 through 79 above are
21  realleged and incorporated herein by reference.

22       109.   At all relevant times herein and in violation of 42 U.S.C. § 12101 *et*
23  *seq.*, Plaintiff was a disabled person who was otherwise qualified to perform the
24  essential functions of her job with or without reasonable accommodation.
25  Defendants and each of them, and/or their agents/employees, refused to engage in
26  the interactive process with Plaintiff as required by law.  Within the time provided
27  by law, Plaintiff filed a complaint, in full compliance with these sections, and a final
28  agency decision was issued.

---

25

COMPLAINT FOR DAMAGES AND OTHER RELIEF

110. As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

111. As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### (Invasion of Privacy – Against Defendants Gutierrez, Estrada, Sheridan and Does 1-10)

112. The allegations set forth in Paragraphs 1 through 111 above are realleged and incorporated herein by reference.

113. This court has jurisdiction over this claim as a claim arising under the United States Constitution and, to the extent it is a state tort claim, as ancillary to the federal claims alleged hereinabove.

114. At all times relevant to this action, Plaintiff had a legally protected interest in private information about her personal life and in not being captured surreptitiously by video cameras while behind closed doors in her office. Plaintiff's legally protect privacy interests include (1) precluding the dissemination or misuse of sensitive and confidential information ("informational privacy"); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ("autonomy privacy"). Plaintiff's privacy rights are protected under common law, under the United States Constitution and

26
COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  under the Constitution of the State of California. *Griswold v. Connecticut,* 381 U.S.
2  479 (1965); *Hill v. National Collegiate Athletic Association,* 7 Cal.4th 1 (1994);
3  *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971).
4      115. At all times relevant to this action, Plaintiff had a reasonable
5  expectation of privacy in private information about her personal life and in not
6  being captured surreptitiously by video cameras while behind closed doors in her
7  office.
8      116. At no time did Plaintiff consent to defendants' actions, and at all times
9  conducted herself consistent with a reasonable expectation of privacy.
10     117. The actions of defendants as described hereinabove constituted a
11 serious invasion of Plaintiff's right of privacy, both by their intrusion into private
12 matters and by their public disclosure of private facts about Plaintiff.
13     118. As a direct and proximate result of defendants' unlawful conduct,
14 Plaintiff has sustained and continues to sustain physical injuries, pain and suffering,
15 humiliation and extreme and severe mental anguish and emotional distress; Plaintiff
16 has incurred and will continue to incur medical expenses for treatment, and for
17 incidental medical expenses; and Plaintiff has suffered and continued to suffer a
18 loss of earnings, pension and other employment benefits.  Plaintiff is thereby
19 entitled to general and  compensatory damages in amounts as prayed below and to
20 be proven at trial.  Wherefore Plaintiff prays for relief as set forth below.
21     119. Defendants' conduct as described above was willful, despicable,
22 knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and
23 exemplary damages in an amount according to proof.
24
25              **PRAYER FOR RELIEF**
26     Wherefore, Plaintiff prays for judgment as follows:
27     1. For all actual, consequential and incidental financial losses including lost
28 wages, lost employment benefits, bonuses, overtime, vacation benefits, medical

1    bills, mental and emotional distress, and other special and general damages
2    according to proof;
3        2.  For compensatory and general damages in an amount to be determined at
4    trial, but not less than $300,000.00.
5        3.  For special damages in an amount to be proven, including out of pocket
6    medical expenses, which are ongoing;
7        4.  For an injunction directing Defendants to post a notice of violations, and
8    to provide remedial training to ASAC Sheridan, and for other appropriate relief
9    according to proof;
10       5.  For punitive damages against Defendant Sheridan and Does 1-10 on the
11   eighth cause of action (invasion of privacy) as allowable by law;
12       6.  For an award of interest, including pre-judgment interest, at the legal rate;
13       7.  For reasonable attorneys' fees pursuant to statute;
14       8.  For costs of suit incurred herein; and
15       9.  For such other and further relief as this court may deem just and proper.
16
17   DATED: March 24, 2008.            THE GILLAM LAW FIRM
18                                     *A Professional Law Corporation*
19
20                              By: _____
21                                     Carol L. Gillam
                                       John Haubrich, Jr.
22                                     Attorneys for Plaintiff Lou VanZant Carter
23
24
25
26
27
28

28
COMPLAINT FOR DAMAGES AND OTHER RELIEF

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action so triable.

DATED: March 24, 2008.

THE GILLAM LAW FIRM
*A Professional Law Corporation.*

By: _____
   Carol L. Gillam
   John Haubrich, Jr.
   Attorneys for Plaintiff Lou VanZant Carter

COMPLAINT FOR DAMAGES AND OTHER RELIEF

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George H. Wu and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV08- 1958 GW (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Lou VanZant Carter

**DEFENDANTS**
Carlos Gutierrez, Secretary of Commerce, Earl Estrada, an individual, Charles Sheridan, an individual, and Does 1 through 10, inclusive

**(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):
Los Angeles

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):
Washington, D.C.

**(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
The Gillam Law Firm
1801 Century Park East
Suite 1560
Los Angeles, CA 90067
(310) 203-9977

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No     ☐ **MONEY DEMANDED IN COMPLAINT:** $ 300,000+

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
42 U.S.C. §2000e-5(f) et seq. Employment discrimination, retaliation under Title VII of the Civil Rights Act, Violation of FMLA and violation of ADA

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☑ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No   ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**   Case Number: _____   **CV08-01958**

CV-71 (07/05)                    CIVIL COVER SHEET                    Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b). RELATED CASES: Have any cases been previously filed that are related to the present case? ☑No  ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

Los Angeles

List the California County, or State if other than California, in which EACH named defendant resides.  (Use an additional sheet if necessary).
☑ Check here if the U.S. government, its agencies or employees is a named defendant.
   Washington, D.C.; Orange, CA;  New York

List the California County, or State if other than California, in which EACH claim arose.  (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
   Los Angeles County

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   March 24, 2008

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lou VanZant Carter, an individual,<br><br>PLAINTIFF(S)<br><br>v.<br><br>Carlos Gutierrez, Secretary of Commerce, Earl<br>Estrada, an individual, Charles Sheridan, an<br>individual, and Does 1 through 10,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV08-01958 GW (SHx)**<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):  Carlos Gutierrez, Secretary of Commerce; Earl Estrada; Charles Sheridan

A lawsuit has been filed against you.

Within  **20**  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Carol Gillam _____, whose address is  The Gillam Law Firm, 1801 Century Park East, Suite 1560, Los Angeles, CA 90067 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____ **MAR 2 4 2008** _____

By: _____
NATALIE LONGORIA
Deputy Clerk

(Seal of the Court)

1198

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*