U.S. DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA

LOU VANZANT CARTER,                )
                                   )
        Plaintiff,                 )
                                   )
            v.                     )        Civil Action No. 08-1958-GW (SHx)
                                   )
CARLOS GUTIERREZ, Secretary,       )
U.S. Department of Commerce,       )
                                   )
        Defendant.                 )
_____)

## DECLARATION OF SUSAN E. THOMAS

I, Susan E. Thomas, pursuant to 28 U.S.C. §1746, declare under penalty of perjury that the following are true and based on my personal knowledge:

1.      I am over the age of 18 and am fully competent to make this declaration.

2.      I am the Chief of the Program Implementation Division, which is contained in the in the Office of Civil Rights (OCR), within the U.S. Department of Commerce (Agency).

3.      My duties include overseeing the Division responsible for processing formal Equal Employment Opportunity (EEO) complaints filed with the Agency. This process involves investigating EEO complaints as well as issuing procedural and merit final Agency decisions.

4.      Through my position, I am familiar with the administrative EEO process and was involved in the processing of Ms. VanZant Carter's formal administrative EEO complaint, Agency Case Number 06-67-00208.

5.      I have been asked to provide certain information concerning Agency Case Number 06-67-00208. Upon reviewing the OCR's official complaint files maintained in the ordinary course of business, I can confirm that:

Page 1 of 2

a.  On November 7, 2006, the Agency received Ms. VanZant Carter's formal EEO complaint alleging that the Agency discriminated against her based on her sex, retaliated against her for engaging in protected EEO activities and retaliated against her in violation of the Whistleblower Protection Act (WPA). *See* Attachment (Attach.) A (formal Complaint) and Attach. B (Notice of Acceptance).

b.  On December 12, 2007, the Agency notified Ms. VanZant Carter that it accepted for investigation her allegations of sex discrimination and EEO retaliation, but dismissed for failure to state a claim, her allegation of retaliation under the WPA. *See* Attach B.

c.  The OCR has no record of ever receiving from Ms. VanZant Carter an EEO complaint alleging disability discrimination, failure to engage in the interactive process, or failure to reasonably accommodate

d.  On February 18, 2008, the Agency issued a Final Agency Decision on the accepted allegations in Agency Case Number  06-67-00208.  The Final Agency Decision found no discrimination or retaliation.

Further declarant sayeth not.

Susan E. Thomas
Chief, Program Implementation Division
Office of Civil Rights
United States Department of Commerce

May 22, 2008
Date

_INV. TM_



**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer and**
**    Assistant Secretary for Administration**
Washington, D.C. 20230

**DEC 0 7 2006**

Ms. Lou VanZant Carter

~~[REDACTED]~~

Complaint Number: 06-67-00208

Dear Ms. Carter:

This is in reference to the mixed case complaint[1] filed by you on November 7, 2006. The Department of Commerce has decided to accept the following bases and claims for investigation.

Complainant, formerly a Criminal Investigator, GS-1811-13/3, with the Los Angeles Field Office, Office of Export Enforcement, Bureau of Industry and Security, alleges that due to sex (female) and retaliation (for reporting to management that she was being treated differently than similarly situated male employees), she has been subjected to acts of disparate treatment and harassment constituting a hostile work environment. She cites the following:

1. On May 1, 2006, Charles Sheridan became her supervisor. Shortly after becoming her supervisor, and realizing that she would not be his "spy" in the office, he started putting pressure on her by demanding more work from her.

2. On June 21, 2006, at approximately 5:20 p.m., she called Sheridan, Special Agent in Charge Earl Estrada, and Special Agent Carlos Olivo (the duty agent that week) to advise them that she was requesting sick leave because she was not feeling well. Later in the day, Estrada canceled her leave and ordered her to report to the office at 1:00 p.m.

Exhibit __5__ p. __1__

---

[1] The Equal Employment Opportunity Commission regulations define a "mixed case" complaint as one in which the alleged discriminatory act is related to or stems from an action that is appealable to the Merit Systems Protection Board. See Title 29, Code of Federal Regulations, section 1614.302(a)(1).

ATTACHMENT      13

3. Upon arriving to the office on June 21, 2006, Sheridan and Estrada questioned her about her whereabouts, and Estrada asked her where she lived, and where she had stayed on the night of June 20, 2006. After telling Estrada that she had stayed at a friend's house, Estrada demanded the name of the friend. Upon telling Estrada her friend's name, and realizing that it was the name of a man, Estrada then asked her if this friend was in law enforcement. When she said yes, Sheridan asked her whether she was sexually intimate with this friend and if she was having a relationship with him. Sheridan continued to ask her additional questions, including whether her friend had taken sick leave or annual leave that day. Later on June 21, 2006, she learned that Sheridan had called her mother and interrogated her mother about her (Complainant's) whereabouts.

4. On June 22, 2006, Sheridan walked into her office, and kept looking at her and yelled, "What the hell were you thinking getting involved with an agent?" She states that Sheridan then started "harassing" her and brought up some of her personal information regarding a past relationship and then asked if her "boyfriend" was married. Sheridan continued to ask her questions about this relationship, and commented that her boyfriend better not be married because they would be in "big trouble" and she would be fired.

5. Later on June 22, 2006, Sheridan said to her, "Lou you are so lucky he was not married because you would have been fired." Later in the same conversation, Sheridan raised his voice and told her that she got involved with an agent that had two children who "fucked you against the wall and now you got involved with another agent who is going to fuck you against the wall too and leave your ass."

6. On June 23, 2006, Sheridan advised her that Estrada was planning on contacting the FBI to inquire about her friend's leave. During this conversation, Sheridan "interrogated" her and asked if her friend was sick and inquired what type of leave her friend took.

7. On June 23, 2006, Sheridan informed her that she had to prepare her travel authorization for a trip to Washington, DC that she was to take on July 4, 2006. When Sheridan presented her with flight information which showed a "3:00 p.m. or so flight" she informed him that she would not be able to make the flight at that time. In response, Sheridan demanded in a loud voice to know why and



ATTACHMENT

2

14

Exhibit 5 p. 2

began to "harass" her.  When she told him that she had to take care of her son, Sheridan then stated, "What about your mother, why can't she take care of him?"  When she told him that her mother had something to do, Sheridan then yelled, "What could YOUR mother possibly have to do on the 4th of July?"  The conversation continued and Sheridan told her that she would personally have to tell Estrada that she could not take the flight, which she later did.

8.  On July 4, 2006, she was not paid holiday pay even though she was on the clock for 3.5 hours, and despite management's insistence that she leave on July 4.

9.  On July 10, 2006, at approximately 1:30 p.m., Sheridan came into her office and asked her questions pertaining to the case that she was working jointly with her husband.[2]  Sheridan later questioned her about whether her husband was going to put her under his health insurance plan, life insurance plan, and list her as his beneficiary.

10. On July 11, 2006, during a meeting with Sheridan and Estrada in Estrada's office, Estrada questioned her about the use of a government vehicle.  Estrada also told Complainant that she had been lying to people about events, and that she had better stop lying about what had happened.  During this meeting, Sheridan and Estrada also told Complainant that people in the office were upset because she did not tell them that she was getting married.  During this same meeting, Sheridan also asked her, in the presence of Estrada, how long she knew her husband prior to getting married and inquired as to how long she had been sexually involved with him.  Sheridan also commented, "I hope that you did not get married just to improve your situation."  She also notes that Estrada added, "Yeah, I thought you had just met each other and were just friends...I mean you had just been dating him for three weeks and now you are married now."  Later during this meeting, Complainant asked if she would be able to work cases with her husband, and Estrada told Complainant that she could submit an e-mail posing that question and then began to laugh uncontrollably and said, "Yeah, then that would prompt them to write a policy on this issue and it will be called the Lou ODM (Office Directive Memorandum)."

---

2 Complainant married the friend referenced in incidents 3 through 6 on July 3, 2006.

11. On July 19, 2006, she went to Sheridan's office to brief him about an undercover operation that had taken place on July 18, 2006, and Sheridan "started going off" on her by cursing at her, using the word "fuck" several times, and referring to her as the "fucking agent." Sheridan also told her that Estrada did not believe her and thought the undercover operation was a "boondoggle" in order for her not to go to the office and attend a scheduled meeting, and questioned her about her whereabouts. Later in the meeting, Sheridan yelled at her and told her that she had better leave before she "pissed him off even more."

12. On July 24, 2006, Sheridan asked her if she still wanted to work for the office since she looked unhappy. During this same conversation, Sheridan asked her if she was planning to stay or if she was planning on leaving, and asked if her husband had told her that he was going to take care of her so that she could be a stay at home mom and no longer have to work. Sheridan added that if she was thinking of leaving or getting a different type of job, she should look for one that was not in law enforcement. Sheridan then stated that she should leave before the new fiscal year because then she would not have something on file that would follow her everywhere. Sheridan also told her that criminal and administrative actions were different and that if she left before any administrative action was taken, the administrative action would just go away the moment she stopped working there. When she asked for clarification about him mentioning "criminal" actions, Sheridan began to yell, "Fuck...don't you fuckin' understand are you fuckin' stupid?" During this same meeting, Sheridan also implied that because she is female, she should not be in law enforcement.

13. On July 25, 2006, Special Agents Derrick Lee and Carlos Olivo approached her regarding conversations that they had with Sheridan regarding Sheridan's plans to suspend her. She also states that Olivo told her that Sheridan wanted a letter stating that she would not sue him. Complainant believes that management was using subordinates to coerce her to write a letter or to force her to leave.

14. On July 27, 2006, Olivo came to her office and asked her again about writing a statement promising not to sue Sheridan.

15. On July 28, 2006, she went to Sheridan's office and asked him about people asking her to write something that she was not going to sue him. In reply, she states that Sheridan told her that he told Lee and Olivo not to get involved in the situation and that they had miscommunicated information, and that he was her friend and did not want her to lose her job. In the same conversation, Sheridan also stated that he had learned that she was planning on suing him and that he implied that he wanted a statement from her stating that she would not sue him, that everything was fair, and that there was no hostile work environment.

16. As soon as Sheridan found out that she would probably sue him, Sheridan kept her away from the office and assigned her field work in far away cities and without per diem compensation. Sheridan also tasked her with more work than any other male agent: She cites the following incidents:

    a. On August 14, 2006, Sheridan walked into her office and ordered her to go on three assignments, directly from the office located in Irvine, California, which required her to drive for over 150 miles for the day, without receiving per diem pay.

    b. On August 15, 2006, she was told that she had to drive from her residence to work on a search warrant in Newhall, California, over 50 miles from her residence, even though male agents in the office were authorized to stay the night prior to the search at a nearby hotel, and received a per diem. After her task was complete at the search site, she was then assigned to drive an additional 55 miles to Camarillo, California for another assignment. For the entire day, she drove over 180 miles without receiving per diem pay.

    c. On August 16, 2006, she was assigned to go to Las Vegas, Nevada, for two assignments, which required her to drive close to 600 miles roundtrip, and for which she did not receive per diem pay.

    d. On August 21, 2006, she was assigned to go to Camarillo, California, then to Agoura Hills, California, and then to Torrance, California, which required her to drive over 160 miles, and for which she did not receive per diem pay.



5

17


Exhibit  S  p.  5

17. On August 26, and August 27, 2006, she worked overtime and at night with the FBI, without getting paid night differential and overtime pay, even though management knew in advance and approved her for this assignment.

18. On August 29, 2006, Special Agent Richard Weir was instructed by Estrada to collect/seize her case files and leads immediately, and Olivo was called back in from the field and instructed to collect whatever property she had in her possession.

19. On August 30, 2006, she tried to log in to her government e-mail account and other databases. However, the system did not recognize her because Sheridan or Estrada had terminated her access to everything, even though she was still an employee with the appropriate security clearances.

20. During a conversation on August 30, 2006, Sheridan questioned why she had gone to the office the night before and claimed that she had committed a "security violation." During this same conversation, Sheridan told her that he was requesting a doctor's note for the sick leave she had taken on August 28 through August 30, 2006, and advised her that if she did not produce a medical note, her annual leave, instead of her sick leave, would be charged. Later on August 30, 2006, she learned that Estrada instructed employee Chris Tereska that she was to be charged annual leave for her absences from August 28 through August 30, 2006.

As a result of the aforementioned acts of disparate treatment and incidents of harassment constituting a hostile work environment:

21. On August 23, 2006, she advised Estrada and Sheridan that she would be resigning. Later, on August 30, 2006, she informed Estrada that she was resigning effective close of business August 30, 2006.

## DISMISSAL

Complainant also alleged retaliation for reporting an incident to the Department of Commerce Office of Inspector General, *i.e.*, whistleblowing. However, whistleblowing does not fall within the purview of Title VII. The Equal Employment Opportunity Commission has held that whistleblower activities are generally outside the purview of



6



Exhibit 5 p. 6

the EEO process. See *Giannou v. Department of Housing and Urban Development*, EEOC Request No. 05880911 (February 13, 1989) (holding that complainant failed to state a claim regarding claims of retaliation for her whistleblower activity). Therefore, Complainant's basis of retaliation, to the extent it relates to her reporting an incident to the Department of Commerce Office of Inspector General, is dismissed, pursuant to 29 C.F.R. § 1614.107(a)(1) for failure to state a claim.

## Rights and Responsibilities

▸ If you believe that the issue(s) in your complaint has/have not been correctly identified, the Chief, Program Implementation Division, must be notified at the address shown below, in writing, within 15 calendar days after receipt of this Notice, specifying why you believe that the issue(s) has/have not been correctly identified.

▸ An investigator will soon contact you to receive your sworn or affirmed statement and the evidence you possess. You and your representative, if represented, will receive a copy of the final Report of Investigation upon its completion.

▸ The investigation must be completed by March 7, 2007, unless you and the Department agree on an extension. See Title 29, Code of Federal Regulations (C.F.R.) section (§) 1614.108(e) Therefore, it is essential that when the investigator asks you for the information to support your complaint, you or designated representative promptly provide it.

▸ You may amend your formal complaint at any time before the investigation is complete. See 29 C.F.R. § 1614.106(d). New claims must be like or related to the claims raised in the original complaint. For example, if the original complaint concerns a Performance Improvement Plan, a new claim concerning his/her subsequent performance rating would be "like or related." A new claim concerning his/her time and attendance would not.

▸ Inasmuch as this is a mixed case, you are not entitled to a hearing. You will receive a Final Agency Decision within 45 days of the date the investigation is completed.

▸ If a final decision is not issued within 120 days of filing of the mixed case complaint, you may appeal the matter to the MSPB at any time thereafter as specified in 5 C.F.R. § 1201.154(b)(2) or you may file a civil action as specified at 1614.310(g), but not both. See 29 C.F.R. § 1614.302(d)(1)(i).

▸ We may dismiss the complaint if you fail to cooperate with the investigation.

▸ If the EEO Officer/Counselor informed you or your designated representative that Alternative Dispute Resolution, through mediation, is an appropriate option in this complaint, you and/or your designated representative, have a right to choose mediation at any time during the



7

19



processing of your formal complaint, including during the investigation. (*The DOC EEO Alternative Dispute Resolution: Mediation Guide* identifies the following cases where mediation is inappropriate: cases involving applicants for employment, former employees, alleged violence, egregious harassment, adverse actions, class actions, when authoritative resolution of a matter is required in precedent-setting cases, when the matter in dispute has significant government policy implications, or when it is important to produce a full public record of the proceedings.)

For your information, I have enclosed an information sheet on EEO Complaint Investigations and EEO mediation.

Amendments to formal complaints, copies of hearing requests, and requests for corrections to the statement of claims should be sent to:

> Susan E. Thomas
> Chief, Program Implementation Division
> Office of Civil Rights, Room 6012
> U.S. Department of Commerce
> Washington, D.C. 20230

Requests for mediation and a copy of the ADR Program Guide should be addressed to the servicing EEO Officer or:

> Bernadette M. Worthy
> Chief, Client Services and Resolution Division
> Office of Civil Rights, Room 6012
> U.S. Department of Commerce
> Washington, DC 20230

Sincerely,

Susan E. Thomas
Chief, Program Implementation Division
Office of Civil Rights

Enclosures

ATTACHMENT

8

Exhibit $S$ p. $8$

$20$

## CERTIFICATE OF SERVICE

I attest that a copy of this Notice of Acceptance of a Mixed Case Complaint for Investigation has been sent to the parties listed below:

<u>By Certified Mail:</u>

Ms. Lou VanZant Carter

<u>Other:</u>

Bernadette M. Worthy
EEO Officer, BIS

Investigation Team

Subject Tab (Tab F)

OCR Chron File


_____
Signature

DEC  7 2000
_____
Date


ATTACHMENT

Exhibit 5 p. 9

21

4 (February 1999)                                                                                    OMB Approval No. 0690-0015

# Complaint of Employment Discrimination
## Against the U.S. Department of Commerce

| For OCR Use | | | |
|---|---|---|---|
| COMPLAINT NUMBER: | 06-67-00208 | Filing Date: | |

## INFORMATION ABOUT YOU

| | | |
|---|---|---|
| Name | Lou VanZant Carter | Social Security Number ▓▓▓▓ |
| Address | ▓▓▓▓ | Home Phone ▓▓▓▓ |
| City/State | ▓▓▓▓ | Zip Code ▓▓▓▓ | Work Phone ( )  N/A |

## INFORMATION ABOUT YOUR REPRESENTATIVE

| | |
|---|---|
| Representative's Name | NOTE: You do not have to have a representative. |
| Address | Phone ( ) |
| | Fax ( ) |
| City/State          Zip Code | Is your representative an attorney? ☐ Yes ☐ No |

## INFORMATION ABOUT THE COMPLAINT

Which bureau did the alleged discrimination take place? *Bureau of Industry and Security, Office of Export Enforcement*

Do you work for the Department of Commerce at the time? ☒ Yes ☐ No  If yes, what was your position (title/series/grade), office, and bureau? *Criminal Investigator, 1811-13-3, Los Angeles Field Office, Office of Export Enforcement*

Describe the action(s) or policy(ies) you believe was (were) discriminatory. Be specific and include dates. If you need more space, attach an extra page(s).

*see attached*

What do you believe was (were) the reason(s) for the alleged discrimination? Check the appropriate box(es) and write in specific details. For example: If it was because of your race, what is your race? If it was because of your age, what is your date of birth?

| | |
|---|---|
| ☐ Race | ☐ National Origin |
| ☐ Color | ☐ Age |
| ☐ Religion | ☐ Disability |
| ☒ Sex | ☒ Retaliation |

What remedy(ies) do you seek for the alleged discrimination? If you need more space, attach an extra page(s).

*See attached*

| | |
|---|---|
| Did you discuss this(ese) issue(s) with an EEO Counselor? ☒ Yes ☐ No  Counselor's name? | |
| Did you file a grievance under a negotiated grievance procedure? ☐ Yes ☒ No  Filing date(s)? | **Exhibit 2 p. 1** |
| Did you file a Merit Systems Protection Board (MSPB) appeal? ☐ Yes ☒ No  Filing date(s)? | |

*LVC*   **ATTACHMENT**   22        10/31/06

SIGN HERE ( OR HAVE YOUR ATTORNEY SIGN FOR YOU)                        DATE ( MONTH/DAY/YEAR)

October 31, 2006

Lou VanZant Carter



Suzan J. Aramaki
Director of Civil Rights
Room 6012 HCHB
U.S. Department of Commerce
Washington, DC 20230

RE:   Supplement to Form CD-498
      Complaint of Employment Discrimination
      Against the U.S. Department of Commerce

Dear Ms. Susan J. Aramaki:

I was a Criminal Investigator/Special Agent (GS-1811-13-3) with the Bureau of
Industry and Security, Office of Export Enforcement (OEE), Los Angeles Field
Office for over seven years.  I had received mostly ratings of Outstanding and
Commendable on my performance appraisals.  I received several cash awards
and I never had any disciplinary problems.

I would not have resigned from my position had it not been for the hostile,
discriminatory, and retaliatory work environment that was created by the current
management, I am seeking full and effective relief with the assistance provided to
me by the U.S. Equal Employment Opportunity Commission (EEOC) for the
discriminatory practices by OEE.

The following is a chronology of the events and background.  I wrote most of
these immediately after the incidents took place or I recorded myself after some
of the incidents had taken place, in order, to create an accurate chronology of
events.  Below is the chronology:

**Describe the action(s) or policy(ies) you believe was(were) discriminatory.
Be specific and include dates.**

Background on Charlie Sheridan's friendship:
Charlie and I attended the Federal Law Enforcement Training Center (FLETC) in
1999; we were in the same class, Criminal Investigator Training Program (CITP).



23

Exhibit 2 p. 2

In approximately 2002, we became very close friends. We mostly communicated by phone and on almost a daily basis. Charlie knew about my problems with my son's father, he knew about my past struggle with the dating scene, and he knew about my mother's recent (2006) battle with cancer. I knew about his personal life, problems at work in the New York Field Office, problems with his stepson and how that had created problems for him and his wife. Sometime in 2006, Charlie had told me that he was no longer having sex with his wife and that they were always arguing. I suggested to him that they attend counseling. Charlie stated that he had suggested that to his wife, but she did not want to attend, so he had given up. Charlie told me that he did not care anymore about the marriage, but only about his children. He told me that I was the only one he could talk to and that I was his confidant.

Charlie had a nationwide reputation in OEE of being a hot head. It was a surprise for OEE street agents to learn that Charlie got promoted because he was known for not having very good people skills. However, the New York Field Office, where he was working, did not want Charlie to be there.

On or about May 1, 2006, Charlie became my immediate supervisor, the Assistant Special Agent in Charge of the Los Angeles Field Office. Initially, Charlie was managing while he was still in New York, so he would consistently call me on the telephone and asked me about everyone's whereabouts, including Estrada's, and what various individuals were and were not doing. Charlie reminded me that I was his confidant. When he reported to the Los Angeles Field Office, located in Irvine, CA, he would pick me up from the office in the mornings and we would go to Starbucks. He would ask me about what people in the office were doing. I became very uncomfortable. Later in May, I began to create a bit of distance. Anytime Charlie would ask me something about someone, I would tell him that I did not know. When Charlie shared something personal about another employee and asked me for my opinion, I would give him a neutral response. Charlie noticed the change in me and realized that I would not be his spy and started putting a bit of pressure by demanding more work from me. At this point, I could not handle this situation with Charlie and I had to see a mental health professional because I was under stress, I could not sleep, and felt ill because of Charlie.

On June 21, 2006 at approximately 5:20am, I called Assistant Special Agent in Charge (ASAC) Charlie Sheridan, Special Agent in Charge (SAC) Estrada Estrada, and Special Agent (SA) Carlos Olivo, who was the duty agent that week, to notify them that I was requesting sick leave because I was not feeling well. After informing the above individuals, I went to sleep. Later in the day, when I woke up, I checked the work phone and noticed that I had missed several calls. Since my work phone was in another room, I did not hear it ring and missed the phone calls. When I contacted Charlie, he canceled my leave and ordered me to report to the office at 1:00pm. As managers, neither Estrada nor Charlie had checked their voices messages.

ATTACHMENT          2      24                    Exhibit 2 p. 3

At 1:00pm, I met with Charlie and SAC Estrada in SAC Estrada's office. The meeting involved questions regarding my whereabouts. OEE had had a nationwide drill involving the recall of all personnel and they were not able to get a hold of me by phone and I was not at my residence.

Estrada asked me where I lived. I told that I lived in Los Angeles and Seal Beach (which I frequented mostly on the weekends). Estrada asked me where I had stayed the night of 6/20/06. I told Estrada I stayed at a friend's house and he demanded his name. I told him my friend's name (this friend was my fiancé). When Charlie heard that it was a male's name, he then asked me if he was in law enforcement. I said yes. Then, Charlie wanted to know if I was sexually intimate with him and if I was having a relationship with him. I stated yes. Charlie asked me what agency did he work for and I stated the FBI. Charlie then asked how long I knew him for and how long had it been since I started having a relationship with him. Charlie also wanted to know if my friend had taken sick leave or annual leave on this day. Charlie seemed very upset to discover that I was in a relationship.

Later that day, I was told by my mother that Charlie had called her up and interrogated her. Charlie was demanding to know where I was and demanding to know where my son was. Charlie knew that my 76 year old mother was not feeling well and that she was recovering from cancer, yet he still chose to call her and interrogate her. My mother was not listed as an emergency contact person precisely because I did not want her to deal with anything adverse because of her health.

June 22, 2006
Charlie walked into my office and asked me how I was doing. Charlie kept looking at me because I did not have anything to tell him. Charlie then yelled at me, "What the hell were you thinking getting involved with an agent?" Charlie then started harassing me and brought up some of my personal information as it related to a relationship from my past. Charlie asked if my boyfriend was married. Charlie asked if I knew for sure that he was not married. Charlie asked me again how long I had known him for. Charlie then said that he better not be married because we would be in big trouble and I would be fired. I told him again that he was not married and I started to cry. Charlie looked upset and told me that he wished he could hug me, but that he was my supervisor and he could not do that and left my office.

Later in the afternoon, I went to Charlie's office to inquire if I could go with Immigration and Customs Enforcement (ICE) on an interview for my case. At some point, Charlie said, "Lou you are so lucky he was not married because you would have been fired. Later in the conversation, Charlie raised his voice and told me that I got involved with an agent that had two children who "Fucked you against the wall and now you got involved with another agent who is going to



3    25



Exhibit 2 p. 4

fuck you against the wall too and leave your ass." I did not respond because I was afraid that if I told him anything, he and Estrada would make my life even more unpleasant at work in which ever way they could. I felt harassed, verbally abused, degraded, insulted, and humiliated. I felt that the way he spoke to me was completely out of line and inappropriate.

June 23, 2006
Charlie came into my office and told me that Estrada was planning on contacting the FBI to inquire about my friend's leave. Charlie interrogated me. Charlie's purpose was to harass and intimidate me. Charlie asked me if my friend was sick. I said no; he was taking care of me. Charlie asked me what type of leave did my friend take and I told Charlie that I did not know. Charlie asked me if he had contacted his supervisor and I told him that I did not know.

Charlie informed me that I had to prepare my travel authorization for a trip to Washington DC that I was to take on the 4th of July. Charlie came into my office and presented me with flight information which showed a 3:00pm or so flight on the 4th of July. I informed him that I would not be able to make the flight at that time, on the 4th of July. Charlie demanded in a loud voice to know why and began to harass me. I told him that I had to take care of my son. Charlie then stated, "What about your mother, why can't she take care of him?" I told him that she had something to do. Charlie then yelled," What could YOUR mother possible have to do on the 4th of July?" I told Charlie she was leaving with my brother and I did not know what they where doing. Charlie was very upset that I could not take the flight that he had selected for me. Charlie then stated that I would personally have to tell Estrada that I could not take that flight. So I went to Estrada's office and told him I could not fly at that time, but that I would look for a later flight. I found a later flight, one which allowed me to be home up until 8:30pm.

It appeared to me that Charlie was trying to not only prevent me from spending time with my family on the 4th of July, but he was in particular doing this because he did not think that as a female agent I would be able to handle this situation. I later spoke with the other female agent in our office, Renee Bohrer, and she too felt that Charlie was particularly more difficult in dealing with the females in the office. SA Bohrer stated that it was very evident that he was especially very hostile and harsh with me than anyone else in the office.

July 3, 2006
I e-mailed my management (Charlie and Estrada) and informed them that I had a change in marital status and that I had gotten married. I asked them to please apprise me of any additional notifications and/or actions that I needed to complete pursuant to the change in my marital status. I never received any information from them regarding this matter.

ATTACHMENT                    26

4

Exhibit 2 p. 5

July 4, 2006
I left my house at 8:30 pm in order to catch a flight to Washington DC. I was on
the clock for 3.5 hours. I was not paid the holiday pay even though my
management insisted that I leave on the 4th of July.

July 10, 2006
 At approximately 1:30pm, Charlie came into my office and asked me questions
pertaining to the case that I was working jointly with my husband. Then Charlie
stated, "I suppose congratulations are in order." He asked if I had gotten married
in Hawaii. Then Charlie proceeded to ask me questions about health insurance,
life insurance, and beneficiary. Charlie asked me if my husband was going to put
me his health insurance plan, life insurance and list me as his beneficiary. The
conversation then moved to talking about his vacation with his family (Charlie
had been away from his family since sometime in May. His family was still living
in New Jersey). Charlie stated that he was having problems selling his house
and if he did not sell his house by September he would be looking for another job
with another agency and not OEE. He stated that he would even take a
demotion.

July 11, 2006
At approximately 1:00pm, Charlie came into my office and told me, "Your
highness would like to see you." I asked him who that was and he did not
respond. I figured it was Estrada. I asked Charlie what the meeting was about
and Charlie did not respond. I asked him if I needed a note pad and then he
responded that if I felt I needed a note pad I should take one with me. I walked to
Estrada's office. Estrada and Charlie were present and the door was closed.
Estrada started the meeting by say that he wanted to let me know what was
going on with the situation. Estrada stated that one of the things that would help
my situation would be the way I would accept responsibility. I told him that I did
not think I had done anything wrong because I had not driven the car for personal
use. I had not gone to my house, but I had gone to my husband's house. I did
not go joy riding or shopping in it. Estrada then became upset and stated that I
was going around lying to people about the events and telling people that I was
actually at my residence in Los Angeles. I told him that I had not made those
statements to anyone. I told him that I had told a couple of people what had
happened factually. Estrada said that he had heard people in the office saying
that I was in trouble for not picking up the phone. Estrada told me that their
hands were tied because they could not talk about the situation to anyone, not
even to clarify what happened so that I better stop lying about what happened. I
told him that if someone was going  around saying that I specifically told them
something that was not factual, then I wanted them (Estrada and Charlie) to bring
that person right here and right now so that I can confront that individual in front
of them for passing around lies and claiming that I said them. Charlie then
interjected and said that that would not be a good idea. Then Estrada stated that
I had told people that he said that I was useless. I told him that I did recall telling
someone.

ATTACHMENT                27

5

Exhibit  2  p. 6

Estrada and Charlie stated that people in the office were very upset because I did not tell them that I was getting married and that I was now married. Estrada and Charlie said that some of these people had known me for 8 years (no one in the office knew me for 8 years). Estrada stated that I was very secretive and not open and that he felt that because I was secretive it looked like if I was doing things that I was not supposed to be doing. I told him that I did not consider myself to be secretive, but a private person and that I did not discuss much of my personal life with people. Estrada then said that is one way of putting it. (Later I asked some people in the office if they were upset because I had gotten married. These people told me that they were never upset, but very happy for me and how ridiculous for management to say those things. Apparently management wanted me to feel bad, isolated, and ostracized in the office).

Charlie began to ask me a question then he stopped and stated that he was putting a caveat on what he was going to ask because he did not know if it was an appropriate question, but that he would let Estrada decide that. Charlie then told Estrada, "Tell me if I should not ask this?" Charlie proceeded to say that he wanted to ask me a question, and that if I did not have to answer the question if I did not want to. Charlie then stated, "How long did you know him (my husband) for? I thought you said four months. Marriage is a hard thing and it appeared that I did not know him for a long time. How long were you seeing him for (sexually)? I hope that you did not get married just to improve your situation." Estrada never stopped Charlie from asking me the question nor did Estrada tell Charlie that it was an inappropriate question. Instead Estrada stated, "Yeah, I thought you had just met each other and were just friends...I mean you had just been dating him for three weeks and now you are married now," Then, I asked if I would be able to work cases with my husband since they had taken away the case that I had been working with him. They both agree that Mike Turner, Director, expressed that he did not want anyone working together that was involved, but if I wanted to forward an e-mail posing that question I could do so. Estrada then began to laugh uncontrollably and said, "Yeah, then that would prompt them to write policy on this issue and it will be called the Lou ODM (Office Directive Memorandum). " Estrada thought his comment was very funny.

July 18, 2006 (Tuesday)
At approximately 5:30pm, while I was out in the field with ICE and OEE agents from Chicago, SA Carlos Olivo called me and asked me what was going on regarding the undercover operation. Carlos wanted to know if the other agents were attempting to push me off of the case or if I simply did not want to attend an 8:00am meeting at Irvine. Carlos stated that Charlie and Estrada would be calling the SAC from the OEE Chicago Field Office and he did not want me to get in trouble. I asked Carlos why I would be in any type of trouble, I told Carlos that it did not matter to me what I was doing tomorrow morning. If Charlie wanted me to attend the meeting and not be part of the undercover operation, I stated that

would be fine. I told Carlos that I would do whatever Charlie wanted me to do regarding this matter. Previously, I had had two conversations with Charlie and he was scrutinizing the entire operation.

July 19, 2006 (Wednesday)
In the morning, I went to Charlie's office to brief him on a undercover operation that had taken place on 7/18/06 and Charlie started going off on me by cursing (using the "Fuck" word several times) at me several times, referring to me as the "Fuckin agent", etc. Charlie stated that Estrada did not believe me and thought it was a boon doggle in order for me not to go in to the office and not attend the meeting. (I found out through another agent that the meeting at the office took place at 9:30am). I told Charlie that when the conflict in schedule came up, I called him and asked him what he wanted me to do. Charlie then said that Estrada believed that I was lying about the undercover operation and I merely wanted to stay at my house in Long Beach and not drive in to Irvine. I told him that I did not have a house in Long Beach (he knew this very well since he had gone looking for me at Seal Beach on 6/21/06, but he wanted me to say Seal Beach and I do not know for what purpose). I then told him if he meant Seal Beach and he said "yeah that place." I told him that I did not stay at Seal Beach and that I was staying at my home in Los Angeles. Then Charlie asked why I was staying in Los Angeles if Seal Beach would be better for me operationally, especially if I needed to be called. I then told him because that is my home and that is where my son was staying. Charlie told me that he had asked Carlos (on 7/18/06) to call me up to find out what was going on with operation. Charlie did not like the statement that I made (about me living in Los Angeles because of my son) and he yelled at me and told me that I better leave his office before I pissed him off even more. I left Charlie's office in tears. Chris Tereska, the Export Compliance Specialist, saw me as I left Charlie's office in tears. She told me that she was sorry that Charlie treated me so bad and that she had heard and witnessed Charlie curse at me. She stated that Charlie treated me so bad and that she had heard him yell at me other times in the past (Chris Tereska's office was directly across from Charlie's).

July 24, 2006
Charlie had been behind close doors with Carlos and Derrick for an extensive amount of time. Later, Charlie came into my office and closed my door. He started his conversation by telling me that he had sent e-mails to everyone not just me and I told him that I knew that. He wanted to know if I still wanted to work here because I looked unhappy. I told him that I was unhappy because of the situation, because I did not know what was going on, because I was required to check out with them (Estrada or Charlie) prior to leaving every day when others did not have to do that (I did not realize I had to do this until this conversation took place), other people could fuel the government vehicle (GOV) on their way to work, but he was directing me not to do that, but to do it on my own time during lunch. I told Charlie that it was GOV maintenance and I should be able to claim it during government time. I also told Charlie that other agents were able to

PT at the beginning of the day or at the end of the day, but that I was not being allowed to do so. Charlie asked me if I was planning to stay here or if I was planning on leaving. Charlie asked if my husband had told me that he was going to take care of me so that I can be a stay-at-home mom and no longer have to work. Charlie told me that if I was thinking of leaving or getting a different type of job, one that was not law enforcement, I should. Charlie stated that I should leave before the new fiscal year (10/01/06) because then I would not have anything on my personnel file. Otherwise, there would be something on my file and it would follow me everywhere. Charlie implied that because I was female I should not be in law enforcement. (Later I found out that this implication was also mentioned to the other female agent) Charlie said that criminal and administrative actions were different and that if I left before any administrative action was taken, then the administrative action would just go away the moment I would stop working here.  I asked for clarification about him mentioning "criminal" and he became very upset and began to yell, "Fuck ...don't you fuckin understand are you fuckin stupid." I then told him that I did not want him to curse at me anymore, that I did not appreciate it, and I did not think it was appropriate. I told him that all the times he had cursed at me in past, had made me very upset because I thought it was very unprofessional and harsh.  I told Charlie that it was very difficult for me to work here under these harsh/hostile conditions, especially when I was being treated different and I was being asked not do things that all the other agents were able to do.  Charlie, then said, "So that's what this is about." Charlie told me that most of the times he spoke to me, he was speaking to me as a friend and rarely as a manager, but that he could start speaking to me like a manager.

On July 24, 2006 at 8:34pm there was a voice message on my phone from a friend, Patti Naughton (a former OEE agent).  She stated in the message that I needed to call her that it was pretty urgent and that it had to do with my situation and to call her at home as soon as I could.

On July 24, 2006 at 9:01pm there was a missed call on my government phone from OEE Special Agent Derrick Lee from my office, telephone number (310)500-7878.

On July 24, 2006 at 9:20pm Patti Naughton (Patti knows Derrick) called me to urge me that something was going to happen at work tomorrow with Charlie because Derrick had told her that Charlie was very upset because I had mentioned something about a hostile work environment and he thought I was going to sue him.  Derrick had been on the telephone with Patti for 1hr1/2. Derrick told Patti that Charlie was thinking about telling Estrada that I was thinking of suing Charlie and if that happened Estrada would take Charlie's recommendation to start proceedings to terminate me,  Derrick told Patti not to tell me of their conversation, but that it was important that Charlie and I make up and be friends in the morning before Estrada got there,

ATTACHMENT        8   30              Exhibit  2  p. 9

July 25, 2006

At approximately 8:30am, I was in Charlie's office and I was about to talk to him, when Derrick walked in and insisted that I go with him and talk to him first. Charlie told me to go ahead and go with Derrick. Derrick and I went downstairs and had a two hour conversation. Derrick told me that what he was about to tell me "never took place" because he had a family that he had to care for and he would do anything to protect the well-being of his family. Derrick said that Charlie could not tell me because he was management, but that I needed to be remorseful of what I did in order to get 10 day suspension. Derrick said that initially the suspension was going to be for 5 days, but something happened and it was increased. I told him that no one had told me what was going on and that I had not heard any of this information at all. Derrick stated that I wouldn't have heard any of this information because they cannot tell me since they are management. Derrick asked me if I was thinking of leaving the job and become a stay-at-home mom, like I always wanted, or if I was going to stay. Derrick said that if I did what they said and showed remorse everything would be okay, but if not Estrada would try to terminate me and if I took action against them, then I would get fired for sure, Charlie would get demoted since he was on probation (became ASAC on or about 5/1/06), and nothing would happen to Estrada. Derrick wanted me to tell Charlie that I was afraid of not knowing what was going to happen and to express to Charlie how much I still liked him. Derrick said that he really cared about me and that's why he was talking to me instead of doing his 8 reports, but that Charlie thought this was important and he had given Derrick more time to do the reports so that Derrick could talk to me. Derrick stated that Charlie had to treat us more harshly than anyone else because we were friends. Derrick said that Charlie was very upset when I got married because Charlie and I were "intimate" friends and that he knew all the details of my situation with my son's biological father. Derrick said that I should be able to figure it out on my own.

July 25, 2006

At approximately 11:20am to 11:40am, Carlos came into my office, after being behind close doors in Charlie's office along with Derrick for approximately over 30 minutes (Rick and Steve knew that Derrick and Carlos were in his office because Steve saw them go in). Carlos told me that he wanted to talk to me regarding my work situation. I told Carlos that I was leaving the office and Carlos stated that he would walk me to my car. As we walked to my car, Carlos said that he can help me and advise me about how to deal with the situation, but that if I was going to sue Charlie, he did not want to get involved or be part of it because he would not be a witness to a harsh environment. Carlos said that he did not want to get involved with this situation at all other than to help me deal with it. However, Carlos then told me that Charlie told him that he believed I was going to sue Charlie based on the conversation I had with Charlie of 7/24/06 ( Charlie informed Carlos and Derrick that I had stated all the foundation for a hostile work environment -1. harsh environment, 2.being treated different than others, 3. Charlie had cursed on several occasions at me, 4, inappropriate



9        31


Exhibit  2  p. 10

behavior). Carlos stated that Charlie was paranoid and told Carlos that he wanted a letter from me stating that I would not sue him. Carlos asked if I was willing to write a letter like that. Carlos stated that Mike Turner (OEE Director) had authorized suspension and that right now I was looking at 10 days suspension, but that if I took the matter through litigation, then Estrada and Charlie would terminate me. Carlos stated that Charlie was going to tell Estrada that he felt he was going to get sued and if I did not sign anything then Estrada would recommend termination. Carlos stated (as Charlie had yesterday in our conversation) that if I wanted to leave the agency and go elsewhere, I should do it before any course of action took place because then it would not become part of my personnel file. Otherwise, the action would follow me and destroy my career. Carlos told me that I should consider writing a letter.

There had been several occasions where management has discussed other employees' personal/work related problems with other subordinates. In this case, management continued to discuss this private pending issue (where it looked like there will be some type of administrative action) with other subordinates. I believe this is highly inappropriate and I didn't know if my rights to privacy had been and were continuing to be violated.

Here you have management using subordinates to coerce me to write a letter by subtly threatening that if I did not, they would move forward with taking action to terminate. Somehow this did not sound nor did it appear to be legal and proper conduct of managers and subordinates. There seemed to be a conspiracy to use subtle bullying tactics in efforts to terminate me or force me to leave.

July 27, 2006 (recording says June 27, 2006)
At approximately 10:40am, (30-40 minute conversation) Carlos came into my office and appeared to be very upset and wanted to know if I had thought about what we talked about yesterday (Carlos referred to yesterday when it was actually two days ago). I asked Carlos to specify. Carlos responded what we talked about when I was walking you to your car. So I responded to him if he was referring to me writing a statement indicating that I will not sue Charlie. Carlos stated yes. I asked Carlos if Charlie had directed him to come to talk to me regarding the statement and Carlos did not answer the question. Carlos then stated that he wanted to know if I was going to sign a statement that I was not suing Charlie because it would be beneficial for everyone involved. I told Carlos that I was not going to write up anything that if they (Charlie, Earl, Carlos) or Charlie wanted to write up something for me to look at and to have a Federal Law Enforcement Officer's Association (FLEOA) attorney look at it that it would be fine. I told Carlos that I was not going to go out of my way to write a statement. Carlos began to get very frustrated and stated that he did not want to get in the middle of this and that he was far too deep already. I asked him again if Charlie had asked him to come over here to propose this to me, but again Carlos did not say anything and did not answer the question, but got more nervous. I told Carlos that Derrick had not mentioned anything about this what

so ever during the conversation we had two days ago. Carlos stated that Derrick was supposed tell me to write a statement and going to talk to me about this, but that Derrick felt uncomfortable talking to me about it. I told Carlos that I was very upset that Carlos and Derrick were directed by Charlie and to threaten me into writing a statement that I would not sue Charlie or I would get fired. I told Carlos that I was also very upset that management disclosed personal information to them (Carlos and Derrick) about my work issues and they knew more about my work issues than I did and that it was not right. Carlos stated that he could understand how Charlie could be upset with me. Carlos stated, "How could I do this to Charlie"… that I was hurting Charlie. I really did not understand what Carlos was talking about regarding this statement. I told Carlos that I was getting very pissed off and that I was prepared to go to talk to Earl and Charlie and have them write whatever statement and I would go ahead and present the statement to an attorney for review, but that I would not be writing a statement. Carlos then stated that I guess he [Charlie] would have to resign and it would be pretty bad for me because they would move on to proceed with termination for me. I told Carlos that it was very upsetting that other subordinates (Carlos and Derrick) knew more about my personal work issues than I did.

July 28, 2006

Today, I went to Charlie's office and I had a conversation with him. I told him that I wanted to know what was going on because I kept having people go into my office and asking me to write something stating that I was not going to sue him (Charlie). Then, Charlie carefully stated that he told Carlos and Derrick not to get involved in the situation, but because they were my friends they had continued to approach me. (I did not initially mentioned Carlos of Derrick's name. Charlie brought up the names). Charlie stated that Derrick had called around and had spoken to someone and that person had told him that I was planning on suing Charlie. Charlie stated that this is how he learned that I was planning on suing him. Charlie went on to say that he was my friend and did not want me to lose my job. Charlie stated that he felt they miscommunicated the information that they wanted to tell me. Charlie stated, "That it was a statement from me stating that I would not be suing Charlie and that there was not a hostile work environment. That everything was fair and there was no hostile work environment." Charlie was implying that this was the type of documentation he (Charlie) wanted. I asked Charlie if I would receive something in writing from Charlie and/or Estrada about having to report to them my daily whereabouts. Charlie stated that I would not because that was entirely up to Estrada and the length of having to report to them was also up to Estrada. I told Charlie that I was very upset with what was going on at the workplace because I was being treated unfairly.

This unfair treatment began as soon as Charlie found out that I was having an intimate relationship with someone. As soon as Charlie found out that I would probably sue him, his retaliatory behavior increased by keeping me away from the office and assigning field work that was in far away cities and without per

diem compensation.  Charlie tasked me with more work than any other male agent.  Charlie wanted to keep me away from the office and away from husband and son so that I would not have any type of normal family life.  The week of August 1, 2006 I was in Washington DC on a case,  The week of August 7, 2006 I was on previously approved Annual Leave (A/L).

August 14, 2006
This was my first day back from A/L.  At 11:00am Charlie walked into my office and ordered me to go on three assignments directly from the office located in Irvine, CA.  There were other male agents in the office, but he sent me.  I drove from Irvine, CA to Agoura Hills, CA (80 miles).  From Agoura Hills, CA I drove to Mission Hills, CA (28 miles).  From Mission Hills, CA I drove to Northridge, CA, and then to my residence (50 miles).  I drove over 150 miles this day without receiving per diem pay.

August 15, 2006
There was a search warrant in Newhall, CA.  This location was over 50 miles from my residence.  Although all the male agents in the office were authorized to stay the night prior to the search, at a hotel, and received per diem, I was not even given that option.  I was told that I had to drive from my residence.  After my task was completed at the search site, I was then assigned to drive an additional 55 miles to Camarillo, CA for another assignment.  This day, I drove from Camarillo, CA to my residence, an additional 81 miles.  I drove over 180 miles this day without receiving per diem pay.

August 16, 2006
This day I was assigned to go to Las Vegas, NV for two assignments.  I drove from my residence to Las Vegas, NV (close to 600 miles roundtrip) and I did not receive per diem pay.

August 17, 2006
I called Charlie and informed him that I would not be in because I could not drive because my eye had started twitching, burning and watery yesterday on my drive back from Las Vegas, NV and this morning it was red, burning, puffy, and I was seeing blurry.

August 18, 2006
I called Charlie and informed him that I would not be in work again because of my eye.  I informed Charlie that I had spoken to an FBI agent yesterday and that FBI had advised that they needed my assistance on a night weekend operation (the weekend of 8/26/06).  Charlie stated that it would be fine for me to attend the operation.

August 21, 2006
This day I was assigned to go to Camarillo, CA, then to Agoura Hills, CA, then to Torrance, CA.  I drove over 160 miles this day without receiving per diem pay.



12        34         Exhibit 2 p. 13

August 23, 2006

I sent an e-mail to Estrada and Charlie and advised them that I was resigning from OEE. The work environment was not improving and I was under a lot stress because of it. I could not sleep. It was affecting my health: I was getting chest pains and fast heart palpitations; I had shortness of breath; I was getting chronic headaches; I felt nauseous; my hands were shaky; I had back, shoulder and neck pain; my eyes were twitching and I was getting blurry vision; my face was breaking out; I had trouble thinking clearly and I could not concentrate.

August 24, 2006

This day the office executed a search warrant in Temecula, CA (85 miles from my residence). This time I was allowed to stay overnight the night before and I did receive per diem pay. After the search warrant was completed, agents (SA Rick Weir, Charlie and I) drove back to the office. When SA Weir arrived at the office, he informed Charlie that he found some weapons, to include a padlocked container, in the trunk of his government owned vehicle (GOV). SA Weir stated that due to officer safety these weapons had been secured and removed from the search warrant site, but they were supposed to be released back to the owner at the conclusion of the search warrant, since these weapons were not part of the items to be seized pursuant to the search warrant. SA Weir believed that Estrada had left them in the GOV, but was not sure.

August 25, 2006

At about 1pm, as I was walking past an office with Estrada, we observed Charlie prying open a padlock on a metal container using some type of lock pick. SA Weir and SA Paul Puletz were in the office observing Charlie attempting to open the padlock. When Estrada observed Charlie prying the lock open, Estrada told Charlie, "I would not open that container without a warrant if I were you." I also told Charlie that he should not open the container. Charlie responded, "We have to return the weapons and I need to know what is in the box before I return it to the owner because he could say he had many things there." SA Weir started walking out of the office, with his hand covering the side of his face, implying that he did not want to be part of what Charlie was about to do. Estrada and I walked away because we were going to start a meeting. Later in the day I had heard that a gun was found in the locked container.

Saturday, August 26, 2006 at 6:00pm to Sunday, August 27, 2006 at 7:00am

I worked overtime and at night with the FBI, without getting paid night differential and overtime pay, even though management knew in advanced and approved for me to work this operation

August 28, 2006

I called in sick, since I had not slept all night (due to previous operation), and was in no condition to drive. This day I received a telephone call at 9:00am from

ATTACHMENT        13    35        Exhibit 2 p. 14

Chris Tereska, urging me to consider LWP instead of resignation. Chris stated that Estrada had instructed her to try to convince me to stay. She stated that she would research the LWP and Stress leave and let me know tomorrow. I spoke with SA Puletz and he confirmed that Charlie had in fact opened the locked container. Charlie used his personal lock picking kit to pry it open and found a 357 gun inside. I reported this illegal search to the Department of Commerce, Office of Inspector General.

August 29, 2006
This morning SA Weir asked me if I had reported the incident, Charlie having pried open a locked container with his personal pick pick without a search warrant. I informed him that I was advised to report the incident by my husband. My husband had to report the incident because he is bound by law to report all illegal incidents to his agency (the FBI).

SA Weir asked me if I thought he should communicate this information to AUSA Sean Lokey, who was the AUSA was assigned to the case. I told him that he should notify the AUSA about the incident and inform him that the incident had been reported to Commerce OIG. SA Weir told me that he felt uncomfortable about talking to the AUSA behind the management's back. SA Weir asked me if he should contact management prior to contacting the AUSA because he was afraid of retaliation from management.

I told him to go ahead and contact management and inform them. After SA Weir spoke with Estrada, Estrada ordered SA Weir to collect/seize my case files and my leads immediately. SA Weir, at the direction of Estrada, informed me that I was not to shred anything or throw anything away as of today and leave my office as it was. SA Carlos Olivo was called back from the field and instructed to collect whatever property I had in my possession.

SA Olivo did not want to accept the agency issued weapon. I told him to keep the agency issued weapon because I never used it, as I always carried my personal weapon for which I had permission to do so. SA Olivo would not accept it because he stated that he was ordered not to accept it. I informed SA Olivo that I would not be taking the weapon and would be leaving it in my office. I left the empty agency issued weapon, unloaded, in its carrier along with the two empty magazines inside a duffle bag along with other property pertaining to the agency, inside my office which is not a public office. The office has an alarm and is set off the moment someone enters the foyer. The foyer area has a camera that records from approximately 6:00pm to approximately 6:00am. According to SA Weir and SA Renee Bohrer, this camera is wired through the undercover computer and Estrada is able to view and monitor movement in this area from his home. Hence, the weapon was left in a secure law enforcement facility.

After SA Weir, SA Olivo, and Chris Tereska collected some property, I was informed of property that needed to be returned to OEE.

 

14

I called Estrada to inquire about my files and status.  Estrada stated that he wanted to make sure that I had enough leave to cover my days.  I asked why he had taken away my files.  Estrada stated that he obtained them because he wanted to keep them for distribution.  I explained that the files were not in an orderly manner, since I was going to put them in order today and tomorrow and now I was not able to do so.  I also asked him why I was ordered to leave my office as it was and not to shred or throw away anything.  Estrada stated that he did not want me to inadvertently shred or throw away something that was needed for a case.  I informed him that I had already shredded and thrown away copies/duplicates of documents pertaining to settled/closed leads/cases.

This day I left early since I had scheduled sick leave from 1pm to 5pm (4hrs).

I received a telephone call from Chris Tereska at approximately 1:24 pm.  I returned Chris' call and she stated that she was looking for my "sign-out/sign-in folder" and that she had just found it.

Later this evening, I returned to the office at approximately 7:30pm to return the remainder of the property and the government owned vehicle (GOV).  Since I live in Los Angeles, I did not want to inconvenience anyone to drop me off at home tomorrow.  My husband drove my personal car and our son rode with him.  My husband assisted me in carrying boxes into the office of property I was returning.

From the office, I called SA Weir and informed him that I was at the office and that I was leaving the GOV there.  I asked him if he had taken the agency issued weapon since it was not in the black duffle bag.  SA Weir stated that SA Olivo had taken possession of it.  I telephoned SA Olivo and he confirmed that he had taken possession of the weapon.  I signed out of the office at approximately 7:40pm (right below SA Weir who had earlier signed out at approximately 17:30).  I left the GOV in the office's parking structure and left in my personal car with my husband and our son.

August 30, 2006
I was the first one in the office.  I noticed that someone had been in my office, sometime between 7:40pm yesterday and this morning (sometime before 8:00am).  I knew that my office had been disturbed because a car model that was in my office had been moved and a plant had been watered.

This morning, SA Steve Huerta, informed me that he and SA Derrick Lee had been called last night and that they had been directed to go to the office to see if everything was fine and/or if anything was missing.  SA Huerta stated that what they (management) were doing to me was not right and that I was being treated like a criminal.

I tried to login to my government e-mail account and other databases and the



system did not recognize me. Charlie and/or Earl had been terminated my access to everything even though I was still an employee with the appropriate security clearances. This was a retaliatory act by management for reporting the previously mentioned incident to Commerce OIG.

Later this morning, SA Weir stated that Charlie wanted to have a conference call with the three of us. SA Weir placed the call and Charlie proceeded to state that he was requesting a doctor's note from me for the times that I had taken/was taking sick leave (8/28/06; 8/29/06; 8/30/06). Charlie stated that if I did not produce this medical note, they would use my annual leave instead of sick leave. Charlie asked why I had gone to the office last night. I told him to return the GOV and other property. Charlie stated that he believed this was a security violation. Charlie asked me who I went to the office with and I told him that I went with my husband and seven year old son. Charlie became very upset when he heard that I had taken my husband and stated that my husband could not be at our office without prior authorization and neither could my son. I told him that I had never heard of such things and that other agents had taken their spouses and/or children to the work place. I told him that my husband had assisted me carrying in some boxes. I told Charlie that I felt his behavior and actions were in retaliation for me reporting him to OIG and that I did not want to speak with him anymore. I stated that if he chooses to speak to me he could do so by contacting my attorney. Charlie did not ask me for my attorney's name.

Later in the morning, Estrada called Chris Tereska and told her to use my annual leave instead of sick leave for the days that I had and/or will be taking sick leave (8/28/06; 8/29/06; 8/30/06).

Later this day at approximately 4:30pm, I called Estrada and informed him that I was resigning effective COB today. I also left voice messages for Chris Tereska and SA Weir since he was acting SAC.


On August 31, 2006 at approximately 12:30pm, my doctor faxed a medical note to (949) 251-9103 to the attention of Chris Tereska. A faxed receipt confirmation was obtained from my doctor's office.

I believe that the aforementioned actions of Charlie and by management's lack of responsibility, meaning their inaction, were violations of my civil rights.


**What remedy(ies) do you seek for the alleged discrimination?**
The remedies that I seek are a favorable letter of recommendation from the agency's Director, compensatory damages, lost benefits, back pay (with interest), expunging of any unfavorable record in my employee file/personnel file, and corrective actions to be taken to correct, stop and remove the source of the discriminatory practices, the source, being the current management.

Additionally, corrective measures should also be placed on those Special Agents that were directed by management to harass and coerce me.  Furthermore, the office has never had any notices posted advising employees of their rights provided to them under the laws that EEOC provides and/or enforces, especially their right to be free from retaliator actions.  Hence, it would be helpful for the entire OEE staff to receive training and/or receive material advising them of these rights.   OEE should be ordered to post such notices at its offices.

Currently, I have not hired legal counsel on this matter.  However, should I hire such counsel; I will be seeking reimbursement of attorney's fees and expenses.

As mentioned before, I would not have resigned from my position had it not been for the hostile, discriminatory, and retaliatory work environment that was created by the current management, I am seeking full and effective relief with the assistance provided to me by the U.S. Equal Employment Opportunity Commission (EEOC) for the discriminatory practices by OEE.

ATTACHMENT

39

17

Exhibit  2  p. 18