THE GILLAM LAW FIRM
*A Professional Law Corporation*
CAROL L. GILLAM, State Bar No. 102354
JOHN HAUBRICH, JR., State Bar No. 228341
1801 Century Park East, Suite 1560
Los Angeles, California 90067
Telephone: (310) 203-9977
Facsimile:  (310) 203-9922
carol@gillamlaw.com; john@gillamlaw.com

Attorneys for Plaintiff Lou VanZant Carter

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU VANZANT CARTER, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> CARLOS GUTIERREZ, SECRETARY OF COMMERCE, EARL ESTRADA, an individual, CHARLES SHERIDAN, an individual, and DOES 1 through 10, <br><br> Defendants. | CASE NO.: CV08-01958GW(SHx) <br><br> FIRST AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION, HARASSMENT AND RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT; VIOLATIONS OF THE REHABILITATION ACT OF 1973; INVASION OF PRIVACY <br><br> [42 U.S.C. § 2000e-5(f) *et seq.*; 29 U.S.C. § 706, 791 *et seq.*] <br><br> JURY TRIAL DEMANDED |

Plaintiff LOU VANZANT CARTER, demanding a jury trial, brings this action against CARLOS GUTIERREZ, SECRETARY OF COMMERCE, CHARLES SHERIDAN, EARL ESTRADA and DOES 1 through 10, inclusive, for general, compensatory and statutory damages, costs and attorneys' fees, and for declaratory and injunctive relief, resulting from Defendants' unlawful and tortious conduct, and as grounds therefor alleges as follows:

////

////

1

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

## JURISDICTION AND VENUE

1.  This action arises under the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) *et seq*. as hereinafter more fully appears and is brought to redress the deprivation of Plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e) *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII")*;* and under the Rehabilitation Act of 1973, 29 U.S.C. §706, *et. seq*.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1343(a)(4); 42 U.S.C. Section 2000e-5(f) and 28 U.S.C. Sections 2201 and 2202.  This suit is authorized and instituted pursuant to Title VII and other federal statutes.  The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by 42 U.S.C. Section 2000e *et seq*.

2.  Venue is proper in the Central District .pursuant to 42 U.S.C. Section 2000e-5(f).

3.  This lawsuit against a governmental agency is permitted under 42 U.S.C.  § 2000e-16.


## ADMINISTRATIVE PROCEDURES/EXHAUSTION OF REMEDIES

4.  Plaintiff has satisfied all of the procedural and administrative requirements necessary to bring this suit, and in particular, those set forth in Sections 706 and 717 of Title VII (42 U.S.C. Sections 2000e-5 and 2000e-16(c)) .

5.  Plaintiff filed a timely written charge of discrimination, harassment and retaliation with the Office of Civil Rights, U.S. Department of Commerce.  A final agency decision was mailed on or about February 20, 2008 and on or about March 14, 2008.  Plaintiff has fully exhausted her administrative remedies before proceeding in this Court.

////

////

///

2

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**PARTIES**

6.  Plaintiff Lou VanZant Carter ("Plaintiff" or "Ms. VanZant Carter") is and was at all times mentioned herein, a citizen of the State of California residing is Los Angeles County and working in Orange County and elsewhere for the U.S. Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement ("OEE").  Plaintiff was a Special Agent (S/A) GS 1811-13-03 federal law enforcement officer at the time she was forced to resign from OEE.

7.  Defendant Carols Gutierrez is the Secretary of the Department of Commerce.  The Department of Commerce was at all times mentioned in this complaint operating in Los Angeles and Irvine, California.  The Los Angeles Field Office of the OEE is located in Irvine, California.

8.  Defendant Earl Estrada ("SAC Estrada") was at all times mentioned herein the Special Agent in Charge ("SAC") of the OEE's field office in Irvine, California.  On information and belief, SAC Estrada is no longer employed by OEE.  SAC Estrada was Plaintiff's second line supervisor at times relevant to this Complaint.

9.  Defendant Charles Sheridan ("ASAC Sheridan") was at all times mentioned herein the Assistant Special Agent in Charge ("ASAC") of the OEE's Los Angeles Field Office.  On information and belief, S/A Sheridan is no longer an ASAC and has been demoted to special agent and relocated to OEE's New York office.  S/A Sheridan was Plaintiff's first line supervisor at times relevant to this Complaint.

**RELEVANT NON-PARTIES**

10.  At all times material to this complaint, the OEE was a governmental agency whose Los Angeles Field Office ("LAFO") is located at 2601 Main Street, Irvine, California 92714 in Orange County, California.

11.  At all times material to this complaint, S/A Derrick Lee and S/A Carlos Olivo were special agents with OEE working in the Los Angeles Field Office.

3

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**

12.  Plaintiff worked as a Special Agent for the OEE and was employed by the OEE for approximately seven years.  She performed her job competently at all relevant times, receiving performance reviews of "outstanding" or "commendable" for most of her career and receiving cash awards regularly.  Plaintiff was stationed at OEE's LAFO at all relevant times.

13.  Upon information and belief and at all times relevant to this Complaint, the Department of Commerce was engaged in an industry affecting commerce that had more than fifty employees within 75 miles of OEE's LAFO for each working day in each of more than twenty calendar weeks in the calendar years involved in this Complaint.

14.  On or about May 1, 2006, ASAC Sheridan became Plaintiff's supervisor, although he was then stationed at the New York Field Office ("NYFO").  Plaintiff was surprised at his promotion to ASAC, as she knew from her years of working with OEE agents throughout the country of Sheridan's reputation as a hothead.  Prior to his relocating to the Irvine office, ASAC Sheridan frequently telephoned Plaintiff and asked her to provide him information about the whereabouts of other OEE employees in the LAFO, primarily about S/A Renee Bohrer, the only other female Special Agent in the office besides Plaintiff.

15.  On one occasion, Sheridan told Plaintiff that S/A Bohrer had requested annual leave and made derogatory comments about her leave request, calling her a "bitch."  Sheridan also said that S/A Bohrer should stay home with her baby and stated or implied that she should not work in law enforcement.

16.  ASAC Sheridan also made derogatory remarks about S/A Bohrer's shooting skills with her government-issued weapon, and claimed he and S/A Olivo were looking into removing her weapon.  Sheridan appeared to gloat about S/A Bohrer's alleged problems with weapons qualifications.

17.  ASAC Sheridan also made derogatory comments to Plaintiff about S/A

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Elizabeth Blanche, the only female agent in the NYFO.  He told Plaintiff that S/A Blanche did not know what she was doing and did not belong in law enforcement, and referred to her in terms like "bitch" and "slut."

18.  In May or June 2006, ASAC Sheridan told Plaintiff that he did not like Chris Tereska, the LAFO Export Compliance Specialist, calling her "that bitch."  He said Ms. Tereska had complained to SAC Estrada about receiving inappropriate treatment from Sheridan.

19.  In May or June 2006, ASAC Sheridan spoke to Plaintiff in the LAFO, asking her whether the color of her bra always matched her pants or blouse, saying he noticed they always seemed to match.  Plaintiff was shocked by this and could not understand how he knew about the color of her undergarments.

20.  Defendant Sheridan told Plaintiff that he hoped she was no longer changing clothes in her office (a private office with a door) because they had placed video recording cameras throughout the office.  Plaintiff felt extremely uncomfortable about Sheridan's comments but was fearful of saying anything.  She was then  unaware of any cameras having been placed in the office or of any authorization for management to observe her behind her office door by way of video surveillance.  On information and belief, Defendant Estrada had the LAFO surreptitiously wired so that he could secretly conduct surveillance of the office from his home, via an undercover computer purchased with government funds.  On information and belief, both Defendants Sheridan and Estrada conducted surveillance of the interior of Plaintiff's office at times when she had a reasonable expectation of privacy therein, including when she was changing clothes behind closed doors.

21.  Some time prior to June 21, 2006, Plaintiff informed ASAC Sheridan that she would not "spy" for him.  Thereafter, ASAC Sheridan put increased pressure to Plaintiff and demanded more work from her than he had previously.

22.  On June 21, 2006, at approximately 5:20 a.m., Plaintiff called ASAC

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Sheridan, SAC Estrada and S/A Olivo to advise them that she was requesting sick leave because she did not feel well. S/A Olivo was the duty agent that week. Ms. VanZant Carter had become violently ill the night before and had been barely able to sleep due to her illness. She was also unable to drive home due to her illness.

23. ASAC Sheridan canceled Plaintiff's sick leave and ordered her to report to the office by 1 p.m. on June 21, 2006 notwithstanding her illness.

24. ASAC Sheridan and SAC Estrada met with Plaintiff upon her arrival in the office. They proceeded to ask Plaintiff extremely personal and embarrassing questions, as detailed below.

25. SAC Estrada demanded to know where Ms. VanZant Carter had stayed the night before (June 20, 2006). Plaintiff responded that she had stayed over at a friend's. SAC Estrada demanded the name of the friend. Plaintiff asked if she had to answer these questions. SAC Estrada said she did. Plaintiff responded that she had stayed at the home of Todd Carter (who was then her fiancé, and shortly thereafter became her husband). Mr. Carter was and is a Special Agent with the Federal Bureau of Investigation ("FBI").

26. ASAC Sheridan then demanded to know whether Plaintiff was sexually intimate with S/A Carter and whether she was in a relationship with him. Plaintiff felt extremely uncomfortable at being asked such questions. ASAC Sheridan demanded to know whether S/A Carter had taken sick leave that day. SAC Estrada and ASAC Sheridan directed Plaintiff to provide him with a written statement that included identification of S/A Carter and the fact that their relationship was sexual in nature. Plaintiff complied, noting in the statement that she understood "that a failure to comply could result in charge of insubordination and include a punishment up to and including removal."

27. That same day (June 21, 2006), ASAC Sheridan had called Plaintiff's mother (whom Sheridan knew was ailing and recovering from cancer) and interrogated her about Plaintiff's whereabouts. Plaintiff had not listed her mother as

1    her emergency contact because of her health and age.

2        28.  Later that same day, Plaintiff learned from her mother that an agent from

3    the LAFO had gone to her house to inquire of her whereabouts and that her mother

4    told the agent Plaintiff was not home.  Plaintiff's mother told her that S/A Sheridan

5    had also called her even though he already knew Plaintiff was not there.

6        29.  The following day, June 22, 2006, ASAC Sheridan went into Plaintiff's

7    office and yelled at her, "What the hell were you thinking getting involved with an

8    agent?"  Sheridan demanded to know whether Mr. Carter was married.  He told

9    Plaintiff that Mr. Carter better not be married or Carter and Plaintiff would be in

10   "big trouble" and Plaintiff would be fired.

11       30.  That same day, Sheridan confronted Plaintiff saying, "Lou, you are so

12   lucky he was not married because you would have been fired " (or words to that

13   effect).  He then raised his voice and said Plaintiff had previously been involved

14   with an agent who had children and who "fu*ked you against the wall and now you

15   got involved with another agent who is going to fu*k you against the wall too and

16   leave your ass."  Plaintiff was extremely upset and completely humiliated by

17   Sheridan's remarks and tone of voice.  Under the guise of claiming Plaintiff had

18   misused her government-owned vehicle ("GOV") by parking it at S/A Carter's

19   home, Sheridan and SAC Estrada were engaging in extremely inappropriate conduct

20   by demanding the most intimate details of Plaintiff's personal life.  Plaintiff could

21   not help but cry.  In fact, Plaintiff behaved responsibly by parking her GOV instead

22   of driving it once she became extremely ill.  Furthermore, numerous male agents

23   used their GOVs for a variety of personal errands and were not disciplined or

24   questioned about intimate details of their personal lives.

25       31.  The following day, June 23, 2006, Sheridan told Plaintiff that SAC

26   Estrada was planning on contacting the FBI to find out about what type of leave S/A

27   Carter tool on June 21.  Sheridan proceeded to grill Plaintiff about whether S/A

28   Carter had also been sick and what type of leave he took.  Plaintiff responded that he

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  was not sick but was taking care of Plaintiff with her illness.

2       32.  That same day, ASAC Sheridan told Plaintiff to prepare a travel

3  authorization to travel to Washington D.C. on the holiday of July 4, 2006.  Sheridan

4  showed her flight information about the flight that would leave around 3 pm on the

5  holiday.  Plaintiff was not due to report to a meeting in Washington D.C. until the

6  following day, July 5, 2006.

7       33.  Plaintiff responded that she could not take that flight.  Sheridan demanded

8  to know, in a loud and threatening voice, why Plaintiff could not take the flight he

9  suggested.  Plaintiff responded that she had to care for her son.  Sheridan then

10  demanded, "What about your mother? Why can't she take care of him?" or words to

11  that effect.  Plaintiff responded that her mother had something to do that day, to

12  which Sheridan yelled, "What could YOUR mother possibly have to do on the 4th of

13  July?" Plaintiff explained that her mother was leaving somewhere with her brother.

14  Again Plaintiff was deeply offended by Sheridan's remarks, attitude and tone of

15  voice.

16       34.  S/A Sheridan then told Plaintiff that she would personally have to explain

17  to SAC Estrada that she could not take the proposed flight, which she did.

18       35.  Plaintiff realized that Sheridan was not only trying to prevent her from

19  having time with her family, but because he believed she could not handle the

20  demands of the job as a female agent with a child.  Plaintiff had learned that her

21  attendance at the meeting in Washington D.C. was not mandatory, and informed

22  ASAC Sheridan of this.  Sheridan insisted she go anyway, even if over $1,000 in

23  government funds would be expended.

24       36.  Plaintiff discussed this incident with the only other female agent in the

25  office, S/A Bohrer, who told her that she too felt that Sheridan was harder on the

26  females in the office than the men, but was especially hostile and harsh with

27  Plaintiff.

28       37.  Plaintiff married Mr. Carter on June 28, 2006, and notified ASAC

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Sheridan and SAC Estrada of her change in status a few days later.  She asked whether she needed to take any other actions, but they never responded.

38.  On July 7, 2006, while Plaintiff was still in Washington D.C., SAC Estrada emailed Plaintiff demanding to know the whereabouts of her time and attendance sheet.  SAC Estrada well knew Plaintiff was in Washington without access to email but was reachable on her cellular phone.  Later that day, Tereska called Plaintiff to notify her that SAC Estrada instructed her (Tereska) not to pay Plaintiff because her time and attendance information was not there.

39.  On July 10, 2006, ASAC Sheridan came into Plaintiff's office and began asking her questions about her health insurance, life insurance and beneficiary, and about whether Mr. Carter would be listing her as a beneficiary on his forms.  ASAC Sheridan was not a Human Resources officer, and Plaintiff felt his questions were intrusive and highly inappropriate.  Plaintiff also took the questions as a threat that she had better be on her husband's plans because her job was about to end.

40.  The following day, July 11, 2006, ASAC Sheridan came to Plaintiff's office and told her, "Your highness would like to see you."  Plaintiff was then made to enter SAC Estrada's office, where a meeting was held behind closed doors.  ASAC Sheridan was also present.

41.  SAC Estrada told Plaintiff that she had been so secretive about her marriage that it looked like she was doing things she was not supposed to do, and that people were upset that she had not told them about her marriage.  Plaintiff learned from other office staff later that they had not been upset, only happy for her.

42.  As the meeting proceeded, S/A Sheridan began to ask Plaintiff a question, then said he would ask SAC Estrada if it was appropriate to ask this.  Sheridan then stated, "How long did you know him (her husband) for?  I thought you said four months.  Marriage is a hard thing and it appeared that you did not know him for a long time.  How long were you seeing him for sexually?  I hope you did not get married just to improve your 'situation.'"  SAC Estrada never stopped Sheridan from

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

making statements or asking questions, and never said it was inappropriate.

43.   Plaintiff then commented that the case she had been working on with her husband had been taken away from her, and asked if she would be able to work on cases with him in the future.  SAC Estrada began to laugh uncontrollably and said, if she wanted to pose that question to the OEE director, she could do that, and then they'd write policy on the issue, saying it would be called the "Lou ODM (Office Directive Memorandum)."

44.  On July 14, 2006, Plaintiff informed ASAC Sheridan that she would be commuting from home to San Diego for two days of firearms qualification, and asked if she would be paid her per diem for those days, since she would be driving 120 miles each way and would have long training days.  Sheridan told her he would not authorize per diem.  Plaintiff believed this was a discriminatory act and knew that male agents were allowed to receive per diem for similar circumstances.

45.  On July 19, 2006, Plaintiff went to ASAC Sheridan's office to brief him on an undercover operation that had taken place the previous day.  Sheridan began cursing at Plaintiff, using the "fu*k" word several times, and calling her a "fu*kin agent."  Sheridan said that SAC Estrada believed that Plaintiff had participated in the undercover operation as a boondoggle to avoid attending a morning meeting in the LAFO.  He further stated that SAC Estrada believed Plaintiff was lying about the undercover operation and that she wanted to stay at her home and not drive in to Irvine.  He grilled Plaintiff about where her home was and why she was staying there.  She explained it was because of her son, and that her mother helped care for him at home.  Sheridan said he did not like Plaintiff stating that she was living in Los Angeles because of her son and yelled at her to lease the office before she "pissed him off" even more.  Plaintiff left his office in tears.

46.  As she left the office, Chris Tereska, whose office was directly across from Sheridan's comforted her and said she was sorry that Sheridan had treated her so badly, and that she had overheard him curse at her.  Tereska also said she had

1    heard Sheridan yell at her other times in the past.

2          47.  The following day, Plaintiff received an email from Sheridan dated the

3    previous day, entitled "Leaving the Office."  Sheridan stated in the email that

4    Plaintiff now had to check with either Sheridan or SAC Estrada before leaving the

5    office, and to inform them of "what is going on, where you will be, and what you are

6    doing." No one else in the office had been placed on such a restriction.

7          48.  On or about July 24, 2006, Plaintiff observed that ASAC Sheridan had

8    been behind closed doors with S/A Lee and Olivo for an extended period of time.

9    After that, Sheridan came to Plaintiff's office and closed the door.  He asked

10   Plaintiff if she still wanted to work at the LAFO because she looked unhappy.

11   Plaintiff said she was unhappy with the situation, and how she was being treated

12   differently from the other employees, especially with having to check in with

13   management each day when no one else was required to do so.  She also noted that

14   other agents were allowed to fuel their GOVs on their way to work while Sheridan

15   had directed Plaintiff to do so on her own time during lunch.  Since this was an

16   official activity, Plaintiff said she should be able to do it during government time

17   like others.  She also told Sheridan that other agents were able to do their physical

18   training ("PT") at the beginning or end of the day, but Plaintiff was not being

19   allowed to do so.

20         49.  Sheridan's response was to ask Plaintiff if she was planning on leaving,

21   and whether Mr. Carter was going to take care of Plaintiff so she could be a stay-at-

22   home mom.  Sheridan continued by stating that if she were going to leave or get

23   another job that was not in law enforcement, to do it before the new fiscal year, and

24   then she would not have something in her personnel file that would follow her

25   everywhere.  Again Sheridan intimated that because she was female, she should not

26   be in law enforcement.  Sheridan also stated that criminal and administrative actions

27   were different, and that if Plaintiff left before any administrative action was taken,

28   then it would just go away as soon as Plaintiff stopped working there.

---

11

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

50.  Plaintiff was alarmed at the suggestion of something criminal happening to her, and asked Sheridan for clarification.  ASAC Sheridan became visibly upset and began to yell at Plaintiff, stating, "Fu*k...don't you fu*kin' understand are you fu*kin' stupid."  Plaintiff said she did not want him to curse at her anymore because it made her very upset and it was unprofessional and harsh.  Plaintiff further stated that it was very difficult to work under current conditions as she was being singled out and being asked not to do things all the other agents were allowed to do. Sheridan then stated, "So that's what this is about."

51.  That same day, July 24, 2006, Plaintiff heard a voice mail message on her phone in the evening stating she had to call urgently about her situation at work. That call was from a former OEE agent, Plaintiff's friend Patti Naughton.  A short time afterwards there was a call from S/A Lee from Plaintiff's office.  Plaintiff spoke to Ms. Naughton around 9:20 p.m.  She warned Plaintiff that something was going to happen at work the next day with ASAC Sheridan, that S/A Lee had told her (Naughton) that Sheridan was very upset because Plaintiff had mentioned a hostile work environment and Sheridan thought Plaintiff was going to sue him.  Naughton explained to Plaintiff that S/A Lee had spent 1 ½ hours on the phone with her.  She related to Plaintiff that Sheridan was thinking of telling SAC Estrada that Plaintiff was thinking on suing Sheridan, and that that if he told Estrada this, Estrada would take Sheridan's recommendation to start proceedings to terminate Plaintiff. Naughton asked Plaintiff not to divulge their conversation, but stated it was important that Sheridan and Plaintiff "make up and be friends" in the morning before SAC Estrada arrived at the office.

52.  The next morning, July 25, 2006, around 8:30 a.m., Plaintiff went to Sheridan's office to talk to him.  S/A Lee came in and insisted that Plaintiff talk to him first, before speaking to Sheridan.  S/A Lee took Plaintiff downstairs and had a two hour conversation with her.  He started by saying what he was about to tell Plaintiff "never took place" because he had a family he had to care for and he would

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

do anything to protect the well-being of his family.  Lee said that Sheridan could not say certain things to Plaintiff because he was management, that Plaintiff needed to show remorse and then she would only get a five or ten day suspension.  Plaintiff said she had not been told anything about such disciplinary action.  Lee said the reason she had not heard about this is because management could not tell her these things because they were management.

53.  S/A Lee continued the conversation with Plaintiff, telling her that if she did not accept the terms then Estrada would try to fire Plaintiff.  He also said that if Plaintiff took action against them, she would be fired for sure.  Lee also said that Sheridan would be demoted since he was still on probation, and that nothing would happen to SAC Estrada.  Lee also said Plaintiff should quit and be a stay-at-home mom and then everything would be okay.  S/A Lee also told Plaintiff that Sheridan had given Lee more time to complete an assignment so he could talk to Plaintiff that morning.  Lee further stated that Sheridan had become very upset at Plaintiff's marriage.  Lee also told Plaintiff she should be able to figure this out on her own.

54.  Later that same morning, July 25, 2006, S/A Olivo came into Plaintiff's office, having just spent time behind closed doors in Sheridan's office with S/As Lee and Sheridan.  Olivo said he wanted to talk with Plaintiff outside the office about her work situation. Olivo said he could help Plaintiff out, but not if she was going to sue Sheridan, as he would not be a witness to a harsh environment.  Olivo told Plaintiff that Sheridan had said he believed Plaintiff was planning to sue him, based on the conversation of the previous day.  He further stated that ASAC Sheridan had told both Olivo and Lee that Plaintiff had stated the foundation for a hostile work environment, because Plaintiff had told Sheridan the environment was harsh, she was being treated differently from others, Sheridan had cursed on several occasions at her, and management had behaved inappropriately.

55.  As the conversation continued, Olivo said Sheridan was paranoid and told Olivo he wanted a letter from Plaintiff stating that she would not sue him.  Olivo

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

asked Plaintiff if she was willing to write a letter that would allow Sheridan to be exonerated from his actions.  S/A Olivo stated that a suspension of ten days had already been authorized but that if Plaintiff sued, Estrada and Sheridan would terminate her.  He proceeded to tell Plaintiff that Sheridan would tell Estrada about his fear of a lawsuit and then Estrada would recommend termination.  Just as Sheridan had the day before, Olivo said that if Plaintiff wanted to leave, she should do so before any action occurred so it would not be part of her personnel file.  Otherwise, he said, the action would follow Plaintiff and destroy her career.  Olivo told Plaintiff she should consider writing the letter.

56.  Plaintiff was very upset that Sheridan was discussing her personal and work-related issues with subordinates such a S/A Lee and S/A Olivo.  She felt very threatened by management's use of subordinates to coerce Plaintiff to write a letter by threatening to fire her if she did not.

57.  The following day, on or about July 26, 2006, SAC Estrada sent Plaintiff an email terminating her participation in a program that had allowed her to schedule her core hours to be from 7 a.m. to 3:30 p.m.

58.  The next day, July 27, 2006, S/A Olivo came to Plaintiff's office and appeared very upset, asking Plaintiff if she had thought about their conversation .  Plaintiff asked Olivo if he meant her writing a statement that she would not sue Sheridan, and he said yes.  Olivo said it would be beneficial for everyone involved if Plaintiff signed the statement that she would not sue.  Plaintiff said she would not write up anything but that if they wanted her to sign something she would have a union attorney look at it.  Olivo appeared very upset, and said he did not want to be involved in this and was already in too deep.  Olivo further stated that S/A Lee was supposed to ask Plaintiff to write the statement but felt uncomfortable asking her to do so.  Olivo also stated that he could understand why Sheridan was upset, and asked Plaintiff how she could do this to him, that she was "hurting Charlie."

59.  Plaintiff responded to Olivo that she was getting upset and would talk to

SAC Estrada and ASAC Sheridan and have them write whatever statement they wanted, and that she would present it to an attorney for review.  Olivo then said Sheridan would have to resign and it would be pretty bad for Plaintiff because management would have to proceed to terminate Plaintiff.  Ms. VanZant Carter responded that it was very upsetting that subordinates such as Olivo and Lee knew more about Plaintiff's personal work issues than she did.

60.  The following day, July 28, 2006, Plaintiff went to ASAC Sheridan's office to speak with him.  She stated that she wanted to know what was going on because people kept coming to her asking her to write something stating she would not sue him.  Sheridan responded that he had told Olivo and Lee not to get involved, but they had done so because they were friends of Plaintiff (Plaintiff had not mentioned Olivo or Lee by name).  Sheridan said he learned Plaintiff was planning to sue him from Lee.  ASAC Sheridan further stated he was Plaintiff's friend and did not want her to lose her hob.  He also said that Olivo and Lee had mis-communicated what they wanted to tell Plaintiff.  Sheridan said, "That it was a statement from me stating that I would not be suing him and that there was not a hostile work environment."  Plaintiff asked if she were going to get something in writing from him or SAC Estrada about the requirement that she report her daily whereabouts.  Plaintiff also told Sheridan she was very upset with what was going on in the workplace because she was being treated unfairly.

61.  Plaintiff was out of the office for the following two weeks, one on business in Washington D.C. testifying before a grand jury, and the second on previously approved annual leave.

62.  On her first day back in the office, August 14, 2006, ASAC Sheridan came into her office and directed her to go on three assignments directly from the office.  There were other agents in the office, all male, but he directed Plaintiff to do all three assignments, which entailed her driving over 150 miles that day without receiving per diem.  Sheridan also told her he was canceling Plaintiff's pre-approved

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

sick leave for August 16 and sending her to Las Vegas as well as to Arizona in the same day.  Plaintiff explained it would be impossible to do both states in one day.  Plaintiff also said this would leave her exhausted for her scheduled firearms training the next two days.  Plaintiff was still required to go to Las Vegas for two assignments, driving almost 600 miles without receiving per diem.

63.  The following day, August 15, Plaintiff was scheduled to participate in a search warrant in Newhall, California.  The participating male agents were authorized to stay the night before the search at a hotel and receive per diem.  Plaintiff was not allowed to do so.  Furthermore, Sheridan told her that as soon as she completed the search warrant, she was to drive to Camarillo and complete another assignment, for a total of 180 driving hours that day.

64.  After completing the Las Vegas trip the day before, Plaintiff called in on August 17 and informed ASAC Sheridan she could not drive to work due to eye problems.  Her eye had been twitching, burning and watering, and was red, burning and puffy, causing blurred vision.  The condition continued the following day and Plaintiff again informed ASAC Sheridan of her need for sick leave.

65.  On Plaintiff's next day at work, August 21, 2006, she was assigned to drive to Camarillo, then to Agoura Hills, then to Torrance, for a total of over 160 hours without receiving per diem pay.  On information and belief, no male agent in the office was receiving multiple driving assignments in a single day as Plaintiff was during this time.

66.  The next day, August 22, Plaintiff received a memorandum from ASAC Sheridan regarding a "Notice of Proposed Suspension" and an attached "Resolution Agreement."  Under the "Resolution Agreement" Plaintiff would waive her rights to file an EEO complaint against the agency, its employees and agents in their official and/or personal capacities.  Plaintiff had never heard of anyone in the OEE office being suspended before.   Male agents had committed egregious acts like drinking on the job or had severe performance deficiencies such as being unable to write

English above a second grade level, and they had not been suspended.

67. The following day, August 23, 2006, Plaintiff succumbed to the pressure. She emailed SAC Estrada and ASAC Sheridan to inform them she would resign. Plaintiff was unable to sleep; she was being required to work long hours and drive long distances on a daily basis; and her health was being adversely affected. In addition to the eye problems, Plaintiff was experiencing chest pains, fast heart palpitations, shortness of breath, chronic headaches, nausea, shaky hands, and back should and neck pain. Her face was breaking out. Plaintiff had trouble thinking clearly and could not concentrate. Plaintiff's conditions constituted a disability within the meaning of the Americans with Disabilities Act, and were known to management. Management had not told Plaintiff when, or even if, the special reporting restrictions imposed only on her would ever end. Plaintiff was fearful from the threats to her career and the warnings to resign before the fiscal year ended to avoid having something in her file that would follow her wherever she tried to work later. Once Plaintiff received the suspension notice and resolution agreement, she knew the situation was hopeless and she had no recourse but to resign.

68. Plaintiff continued to suffer harassment after giving notice of her intent to resign. She worked through the night Saturday, August 26 on an approved assignment but did not receive overtime pay, night differential or a compensatory day.

69. On August 28, 2006, Plaintiff called in sick, having not slept all night due to the operation described above. Plaintiff received a call from Chris Tereska, stating that SAC Estrada had instructed her to try to convince Plaintiff not to quit, but to consider leave without pay instead.

70. That same day, Plaintiff reported an illegal search she observed being conducted by ASAC Sheridan a few days earlier to the Office of the Inspector General of the Department of Commerce ("OIG"). She informed another agent (S/A Richard Weir) of having done so, and he asked if they should communicate the fact

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

of the illegal search to the Assistant United States Attorney ("AUSA") assigned to the case as well.  S/A Weir said he feared retaliation from management if they told the AUSA.  Plaintiff told S/A Weir to inform management of the fact that she had notified the OIG's office and that they would be informing the AUSA.

71.  Immediately after S/A Weir informed  SAC Estrada of these facts, S/A Weir came to Plaintiff and said Estrada had ordered him to seize Plaintiff's case files and leads immediately, and to tell Plaintiff not to shred or destroy anything.  S/A Olivo was called out of the field and instructed to collect whatever property Plaintiff had in her possession.  Olivo refused to take Plaintiff's government-issued weapon, so Plaintiff told him she would leave it in her office, unloaded, secured inside her office.  On information and belief, A/S Weir is now an ASAC.  72.  Plaintiff called SAC Estrada, who was in Chicago on training with ASAC Sheridan, and asked him why he had taken away her files.  Plaintiff explained she had wanted to put them in order before her final day the following week.

73.  The following morning Plaintiff came to work and saw her office had been disturbed.  S/A Steven Huerta told her that he and S/A Lee had been called in to check her office to see if anything was missing.  Huerta told Plaintiff this was not right and that Plaintiff was being treated like a criminal.

74.  Plaintiff attempted to log in to her government email account and other databases and the systems did not recognize her, even though she was still employed and had appropriate security clearances and her resignation was not to take effect until the following week.

75.  Later that morning, ASAC Sheridan told Plaintiff, by a conference call, that she had to produce a doctor's note for sick leave or else it would be charged to annual leave.  He gave no reason for this.  Plaintiff learned later that day that SAC Estrada had called Tereska and told her to charge Plaintiff's sick days to annual leave.  Plaintiff did obtain a doctor's note and had it taxed to Tereska.

76.  Plaintiff was never informed of her right to file an EEO complaint, had no

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

access to an EEO Counselor, and knew of no way to attempt to resolve her issues with management.  Her situation had become hopeless.  Plaintiff would not have resigned but for the hostile, discriminatory and retaliatory work environment she had experienced.

77.  Plaintiff observed that SAC Estrada only hired male agents during her tenure even though qualified female agents had applied for jobs.  On information and belief, since Plaintiff was forced to resign, OEE has not hired any female agents in the LAFO.  On information and belief, there are currently no female agents in the LAFO, as S/A Bohrer has become an analyst instead of a special agent.  On information and belief, Chris Tereska also filed an EEO complaint against ASAC Sheridan for gender discrimination.  On information and belief the LAFO has had no fewer than four EEO complaints filed in the past few years.  On information and belief OEE has taken no steps to remedy pervasive discrimination and harassment occurring in the file offices including the LAFO.

78.  In May or June 2006, an office presentation was held in which two male agents received 10 year government plaques.  Plaintiff did not, even though she had completed 10 years of government service at the time of the presentation.  Plaintiff inquired about this matter several times while she worked there.  Only months after she was forced to quit did Plaintiff finally receive her plaque and pin, with no letter or note attached.  They were sent by SAC Estrada.

79.  As a result of all of the foregoing, Plaintiff sought psychological counseling throughout the periods described above.  She has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings and other employment benefits.  Plaintiff has also had to retain legal counsel to address the violations of her civil rights as described hereinabove.

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CAUSE OF ACTION**

**(Gender Discrimination – Against Defendant Gutierrez)**

80.   The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

81.  At all relevant times herein and in violation of 42 U.S.C. § 2000e-2(a) *et seq.* , Plaintiff was a member of a protected class who performed her job satisfactorily and defendants and each of them, and/or their agents/employees, discriminated against Plaintiff because of her gender in employment decisions. Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and received a final agency decision.

82.  The conditions described above constituted a hostile work environment on the basis of Plaintiff's gender.  The harassment she experienced was severe and pervasive and altered the terms and conditions of her employment.  The conditions were so intolerable that a reasonable person in Plaintiff's position would have been compelled to resign.

83.  As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

84.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

## SECOND CAUSE OF ACTION

### (Retaliation – Against Defendant Gutierrez)

85.     The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

86.  At all relevant times herein and in violation of 42 U.S.C. § 2000e-3(a) *et seq.*, defendants and each of them, and/or their agents/employees, retaliated against Plaintiff by adversely affecting Plaintiff's employment and retaliating against her after she complained to management about disparate treatment, declined to sign a letter promising not to sue ASAC Sheridan, reported ASAC Sheridan's unlawful conduct to the OIG, and otherwise engaged in protected activity.  Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and received a final agency decision.

87.  As a proximate result of defendants' willful, knowing, and intentional retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

88.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

////

////

////

////

////

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**THIRD CAUSE OF ACTION**

**(Violation of 29 U.S.C. §706; 791 *et. seq*. - Rehabilitation Act of 1973, as Amended - Disability Discrimination – Against Defendant Gutierrez and Does 1-10)**

100.   The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

101.  At relevant times herein and in violation of 29 C.F.R. §1614.203(a), Plaintiff was a disabled person who was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation.  Plaintiff's disabilities substantially limited her ability to drive, walk and shoot a weapon. Defendants and each of them, and/or their agents/employees, discriminated against Plaintiff because of her disabilities and/or because of her perceived disabilities. Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and received a final agency decision.

102.  As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

103.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

////

////

////

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**FOURTH CAUSE OF ACTION**

**(Violation of 29 U.S.C. §706; 791, *et. seq*. - Rehabilitation Act of 1973, as**

**Amended - Failure to Accommodate**

**- Against Defendant Gutierrez and Does 1-10)**

104.  The allegations set forth in Paragraphs 1 through 79 above are realleged and incorporated herein by reference.

105.  At all relevant times herein and in violation of 29 U.S.C. §706, *et. seq*., Plaintiff was a disabled person who was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation.  Defendants and each of them, and/or their agents/employees, refused to accommodate Plaintiff as required by law.

106.  As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

107.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

**FIFTH CAUSE OF ACTION**

**(Violation of 29 U.S.C. §706; 791, *et. seq*. - Rehabilitation Act of 1973, as**

**Amended - Failure to Engage in Interactive Process - Against Defendant**

**Gutierrez and Does 1-10)**

108.   The allegations set forth in Paragraphs 1 through 79 above are realleged

23

and incorporated herein by reference.

109.  At all relevant times herein and in violation of 42 U.S.C. § 12101 *et seq.*, Plaintiff was a disabled person who was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation.  Defendants and each of them, and/or their agents/employees, refused to engage in the interactive process with Plaintiff as required by law.  Within the time provided by law, Plaintiff filed a complaint, in full compliance with these sections, and a final agency decision was issued.

110.  As a proximate result of defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

111.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts as prayed below and to be proven at trial. Wherefore Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

### (Invasion of Privacy – Against Defendants Estrada, Sheridan and Does 1-10)

112.  The allegations set forth in Paragraphs 1 through 111 above are realleged and incorporated herein by reference.

113.  This court has jurisdiction over this claim as a claim arising under the United States Constitution and, to the extent it is a state tort claim, as ancillary to the federal claims alleged hereinabove.

114.  At all times relevant to this action, Plaintiff had a legally protected

interest in private information about her personal life and in not being captured surreptitiously by video cameras while behind closed doors in her office.  Plaintiff's legally protect privacy interests include (1) precluding the dissemination or misuse of sensitive and confidential information ("informational privacy"); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ("autonomy privacy").  Plaintiff's privacy rights are protected under common law, under the United States Constitution and under the Constitution of the State of California.  *Griswold v. Connecticut,* 381 U.S. 479 (1965); *Hill v. National Collegiate Athletic Association*, 7 Cal.4th 1 (1994); *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

115.  At all times relevant to this action, Plaintiff had a reasonable expectation of privacy in private information about her personal life and in not being captured surreptitiously by video cameras while behind closed doors in her office.

116.  At no time did Plaintiff consent to defendants' actions, and at all times conducted herself consistent with a reasonable expectation of privacy.

117.  The actions of defendants as described hereinabove constituted a serious invasion of Plaintiff's right of privacy, both by their intrusion into private matters and by their public disclosure of private facts about Plaintiff.

118.  As a direct and proximate result of defendants' unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, humiliation and extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continued to suffer a loss of earnings, pension and other employment benefits.  Plaintiff is thereby entitled to general and  compensatory damages in amounts as prayed below and to be proven at trial.  Wherefore Plaintiff prays for relief as set forth below.

119.  Defendants' conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and

exemplary damages in an amount according to proof.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment as follows:

1.  For all actual, consequential and incidental financial losses including lost wages, lost employment benefits, bonuses, overtime, vacation benefits, medical bills, mental and emotional distress, and other special and general damages according to proof;

2.  For compensatory and general damages in an amount to be determined at trial, but not less than $300,000.00.

3.  For special damages in an amount to be proven, including out of pocket medical expenses, which are ongoing;

4.  For an injunction directing Defendants to post a notice of violations, and to provide remedial training to ASAC Sheridan and Estrada, and for other appropriate relief according to proof;

5.  For punitive damages against Defendant Sheridan and Estrada and Does 1-10 on the eighth cause of action (invasion of privacy) as allowable by law;

6.  For an award of interest, including pre-judgment interest, at the legal rate;

7.  For reasonable attorneys' fees pursuant to statute;

8.  For costs of suit incurred herein; and

9.  For such other and further relief as this court may deem just and proper.


DATED: June 16, 2008.                THE GILLAM LAW FIRM
                                     *A Professional Law Corporation*



                                     By: /s/ John Haubrich, Jr.
                                        Carol L. Gillam
                                        John Haubrich, Jr.
                                        Attorneys for Plaintiff Lou VanZant Carter

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2        Plaintiff hereby demands a jury trial on all causes of action so triable.

3

4    DATED: June 16, 2008.     THE GILLAM LAW FIRM
                                *A Professional Law Corporation.*

5

6                         By: <u>/s/ John Haubrich, Jr.</u>
                              Carol L. Gillam

7                              John Haubrich, Jr.

8                              Attorneys for Plaintiff Lou VanZant Carter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

**PROOF OF SERVICE**

I, the undersigned, declare that I am over the age of eighteen years, employed in the County of Los Angeles and not a party to the above-entitled cause; my business address is THE GILLAM LAW FIRM, P.C.,1801 Century Park East, Suite 1560, Los Angeles, California 90067.

On June 16, 2008, I served a copy of the following documents:

FIRST AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION, HARASSMENT AND RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT; VIOLATIONS OF THE REHABILITATION ACT OF 1973; INVASION OF PRIVACY

on the interested party in this action by placing true copy thereof, enclosed in sealed envelope, addressed as follows:

Thomas P. O'Brien, Esq.
Leon W. Weidman, Esq.
Indira J. Cameron-Banks, Esq.
United States Attorney's Office
300 North Los Angeles Street,
Room 7516 Federal Building
Los Angeles, CA 90012

[**X**]      (BY NOTICE OF ELECTRONIC FILING) The above-listed counsel have consented to electronic service and have been automatically served by the Notice of Electronic Filing, which is automatically generated by CM/ECF at the time said document was filed, and which constitutes service pursuant to FRCP 5(b)(2)(D).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 16, 2008, in Los Angeles, California.

/s/ Carol L. Gillam
Carol L. Gillam