UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU VANZANT CARTER,<br>Plaintiff,<br><br>v.<br><br>CARLOS GUTIERREZ, SECRETARY<br>OF COMMERCE, EARL ESTRADA,<br>CHARLES SHERIDAN, and DOES 1-10<br>Defendants. | Case No: CV08-01958 |

## DECLARATION OF M. TIMOTHY CONNER

M. TIMOTHY CONNER deposes and says:

1. I am Chief of the General Litigation Division, Office of the General Counsel, United States Department of Commerce, and in such capacity I receive, process, maintain and have custody of all documents submitted as claims pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, with the Department or any of its constituent agencies, including the Bureau of Industry and Security.

2. That a careful review of said records and files indicates that no claim or any submission purporting to be a claim under the FTCA has ever been received by my office from Lou Vanzant Carter or anyone acting on her behalf.

I declare under penalty or perjury, in accordance with the provisions of 28 U.S.C. § 1746, that the above statement is true and correct.

Executed by me on this 8th day of May 2008.

_____
M. TIMOTHY CONNER



7

U.S. DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU VANZANT CARTER, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 08-1958-GW (SHx) |
| ) | |
| CARLOS GUTIERREZ, Secretary, ) | |
| U.S. Department of Commerce, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF SUSAN E. THOMAS

I, Susan E. Thomas, pursuant to 28 U.S.C. §1746, declare under penalty of perjury that the following are true and based on my personal knowledge:

1. I am over the age of 18 and am fully competent to make this declaration.

2. I am the Chief of the Program Implementation Division, which is contained in the in the Office of Civil Rights (OCR), within the U.S. Department of Commerce (Agency).

3. My duties include overseeing the Division responsible for processing formal Equal Employment Opportunity (EEO) complaints filed with the Agency. This process involves investigating EEO complaints as well as issuing procedural and merit final Agency decisions.

4. Through my position, I am familiar with the administrative EEO process and was involved in the processing of Ms. VanZant Carter's formal administrative EEO complaint, Agency Case Number 06-67-00208.

5. I have been asked to provide certain information concerning Agency Case Number 06-67-00208. Upon reviewing the OCR's official complaint files maintained in the ordinary course of business, I can confirm that:

Page 1 of 2



a. On November 7, 2006, the Agency received Ms. VanZant Carter's formal EEO complaint alleging that the Agency discriminated against her based on her sex, retaliated against her for engaging in protected EEO activities and retaliated against her in violation of the Whistleblower Protection Act (WPA). *See* Attachment (Attach.) A (formal Complaint) and Attach. B (Notice of Acceptance).

b. On December 12, 2007, the Agency notified Ms. VanZant Carter that it accepted for investigation her allegations of sex discrimination and EEO retaliation, but dismissed for failure to state a claim, her allegation of retaliation under the WPA. *See* Attach B.

c. The OCR has no record of ever receiving from Ms. VanZant Carter an EEO complaint alleging disability discrimination, failure to engage in the interactive process, or failure to reasonably accommodate

d. On February 18, 2008, the Agency issued a Final Agency Decision on the accepted allegations in Agency Case Number 06-67-00208. The Final Agency Decision found no discrimination or retaliation.

Further declarant sayeth not.

Susan E. Thomas
Chief, Program Implementation Division
Office of Civil Rights
United States Department of Commerce

May 22, 2008
Date

Page 2 of 2



9

*INV. TM*



UNITED STATES DEPARTMENT OF COMMERCE
**Chief Financial Officer and**
  **Assistant Secretary for Administration**
Washington, D.C. 20230

DEC 07 2006

Ms. Lou VanZant Carter

~~████████~~
~~████████~~

Complaint Number: 06-67-00208

Dear Ms. Carter:

This is in reference to the mixed case complaint[1] filed by you on November 7, 2006. The Department of Commerce has decided to accept the following bases and claims for investigation.

> Complainant, formerly a Criminal Investigator, GS-1811-13/3, with the Los Angeles Field Office, Office of Export Enforcement, Bureau of Industry and Security, alleges that due to sex (female) and retaliation (for reporting to management that she was being treated differently than similarly situated male employees), she has been subjected to acts of disparate treatment and harassment constituting a hostile work environment. She cites the following:
>
> 1. On May 1, 2006, Charles Sheridan became her supervisor. Shortly after becoming her supervisor, and realizing that she would not be his "spy" in the office, he started putting pressure on her by demanding more work from her.
>
> 2. On June 21, 2006, at approximately 5:20 p.m., she called Sheridan, Special Agent in Charge Earl Estrada, and Special Agent Carlos Olivo (the duty agent that week) to advise them that she was requesting sick leave because she was not feeling well. Later in the day, Estrada canceled her leave and ordered her to report to the office at 1:00 p.m.

Exhibit __S__ p. __1__

---

[1] The Equal Employment Opportunity Commission regulations define a "mixed case" complaint as one in which the alleged discriminatory act is related to or stems from an action that is appealable to the Merit Systems Protection Board. See Title 29, Code of Federal Regulations, section 1614.302(a)(1).

**ATTACHMENT** 10

3. Upon arriving to the office on June 21, 2006, Sheridan and Estrada questioned her about her whereabouts, and Estrada asked her where she lived, and where she had stayed on the night of June 20, 2006. After telling Estrada that she had stayed at a friend's house, Estrada demanded the name of the friend. Upon telling Estrada her friend's name, and realizing that it was the name of a man, Estrada then asked her if this friend was in law enforcement. When she said yes, Sheridan asked her whether she was sexually intimate with this friend and if she was having a relationship with him. Sheridan continued to ask her additional questions, including whether her friend had taken sick leave or annual leave that day. Later on June 21, 2006, she learned that Sheridan had called her mother and interrogated her mother about her (Complainant's) whereabouts.

4. On June 22, 2006, Sheridan walked into her office, and kept looking at her and yelled, "What the hell were you thinking getting involved with an agent?" She states that Sheridan then started "harassing" her and brought up some of her personal information regarding a past relationship and then asked if her "boyfriend" was married. Sheridan continued to ask her questions about this relationship, and commented that her boyfriend better not be married because they would be in "big trouble" and she would be fired.

5. Later on June 22, 2006, Sheridan said to her, "Lou you are so lucky he was not married because you would have been fired." Later in the same conversation, Sheridan raised his voice and told her that she got involved with an agent that had two children who "fucked you against the wall and now you got involved with another agent who is going to fuck you against the wall too and leave your ass."

6. On June 23, 2006, Sheridan advised her that Estrada was planning on contacting the FBI to inquire about her friend's leave. During this conversation, Sheridan "interrogated" her and asked if her friend was sick and inquired what type of leave her friend took.

7. On June 23, 2006, Sheridan informed her that she had to prepare her travel authorization for a trip to Washington, DC that she was to take on July 4, 2006. When Sheridan presented her with flight information which showed a "3:00 p.m. or so flight" she informed him that she would not be able to make the flight at that time. In response, Sheridan demanded in a loud voice to know why and

began to "harass" her. When she told him that she had to take care of her son, Sheridan then stated, "What about your mother, why can't she take care of him?" When she told him that her mother had something to do, Sheridan then yelled, "What could YOUR mother possibly have to do on the 4th of July?" The conversation continued and Sheridan told her that she would personally have to tell Estrada that she could not take the flight, which she later did.

8. On July 4, 2006, she was not paid holiday pay even though she was on the clock for 3.5 hours, and despite management's insistence that she leave on July 4.

9. On July 10, 2006, at approximately 1:30 p.m., Sheridan came into her office and asked her questions pertaining to the case that she was working jointly with her husband.2 Sheridan later questioned her about whether her husband was going to put her under his health insurance plan, life insurance plan, and list her as his beneficiary.

10. On July 11, 2006, during a meeting with Sheridan and Estrada in Estrada's office, Estrada questioned her about the use of a government vehicle. Estrada also told Complainant that she had been lying to people about events, and that she had better stop lying about what had happened. During this meeting, Sheridan and Estrada also told Complainant that people in the office were upset because she did not tell them that she was getting married. During this same meeting, Sheridan also asked her, in the presence of Estrada, how long she knew her husband prior to getting married and inquired as to how long she had been sexually involved with him. Sheridan also commented, "I hope that you did not get married just to improve your situation." She also notes that Estrada added, "Yeah, I thought you had just met each other and were just friends...I mean you had just been dating him for three weeks and now you are married now." Later during this meeting, Complainant asked if she would be able to work cases with her husband, and Estrada told Complainant that she could submit an e-mail posing that question and then began to laugh uncontrollably and said, "Yeah, then that would prompt them to write a policy on this issue and it will be called the Lou ODM (Office Directive Memorandum)."

---

2 Complainant married the friend referenced in incidents 3 through 6 on July 3, 2006.

**ATTACHMENT** 3 Exhibit 5 p. 3

12

11. On July 19, 2006, she went to Sheridan's office to brief him about an undercover operation that had taken place on July 18, 2006, and Sheridan "started going off" on her by cursing at her, using the word "fuck" several times, and referring to her as the "fucking agent." Sheridan also told her that Estrada did not believe her and thought the undercover operation was a "boondoggle" in order for her not to go to the office and attend a scheduled meeting, and questioned her about her whereabouts. Later in the meeting, Sheridan yelled at her and told her that she had better leave before she "pissed him off even more."

12. On July 24, 2006, Sheridan asked her if she still wanted to work for the office since she looked unhappy. During this same conversation, Sheridan asked her if she was planning to stay or if she was planning on leaving, and asked if her husband had told her that he was going to take care of her so that she could be a stay at home mom and no longer have to work. Sheridan added that if she was thinking of leaving or getting a different type of job, she should look for one that was not in law enforcement. Sheridan then stated that she should leave before the new fiscal year because then she would not have something on file that would follow her everywhere. Sheridan also told her that criminal and administrative actions were different and that if she left before any administrative action was taken, the administrative action would just go away the moment she stopped working there. When she asked for clarification about him mentioning "criminal" actions, Sheridan began to yell, "Fuck...don't you fuckin' understand are you fuckin' stupid?" During this same meeting, Sheridan also implied that because she is female, she should not be in law enforcement.

13. On July 25, 2006, Special Agents Derrick Lee and Carlos Olivo approached her regarding conversations that they had with Sheridan regarding Sheridan's plans to suspend her. She also states that Olivo told her that Sheridan wanted a letter stating that she would not sue him. Complainant believes that management was using subordinates to coerce her to write a letter or to force her to leave.

14. On July 27, 2006, Olivo came to her office and asked her again about writing a statement promising not to sue Sheridan.

15. On July 28, 2006, she went to Sheridan's office and asked him about people asking her to write something that she was not going to sue him. In reply, she states that Sheridan told her that he told Lee and Olivo not to get involved in the situation and that they had miscommunicated information, and that he was her friend and did not want her to lose her job. In the same conversation, Sheridan also stated that he had learned that she was planning on suing him and that he implied that he wanted a statement from her stating that she would not sue him, that everything was fair, and that there was no hostile work environment.

16. As soon as Sheridan found out that she would probably sue him, Sheridan kept her away from the office and assigned her field work in far away cities and without per diem compensation. Sheridan also tasked her with more work than any other male agent: She cites the following incidents:

   a. On August 14, 2006, Sheridan walked into her office and ordered her to go on three assignments, directly from the office located in Irvine, California, which required her to drive for over 150 miles for the day, without receiving per diem pay.

   b. On August 15, 2006, she was told that she had to drive from her residence to work on a search warrant in Newhall, California, over 50 miles from her residence, even though male agents in the office were authorized to stay the night prior to the search at a nearby hotel, and received a per diem. After her task was complete at the search site, she was then assigned to drive an additional 55 miles to Camarillo, California for another assignment. For the entire day, she drove over 180 miles without receiving per diem pay.

   c. On August 16, 2006, she was assigned to go to Las Vegas, Nevada, for two assignments, which required her to drive close to 600 miles roundtrip, and for which she did not receive per diem pay.

   d. On August 21, 2006, she was assigned to go to Camarillo, California, then to Agoura Hills, California, and then to Torrance, California, which required her to drive over 160 miles, and for which she did not receive per diem pay.

17. On August 26, and August 27, 2006, she worked overtime and at night with the FBI, without getting paid night differential and overtime pay, even though management knew in advance and approved her for this assignment.

18. On August 29, 2006, Special Agent Richard Weir was instructed by Estrada to collect/seize her case files and leads immediately, and Olivo was called back in from the field and instructed to collect whatever property she had in her possession.

19. On August 30, 2006, she tried to log in to her government e-mail account and other databases. However, the system did not recognize her because Sheridan or Estrada had terminated her access to everything, even though she was still an employee with the appropriate security clearances.

20. During a conversation on August 30, 2006, Sheridan questioned why she had gone to the office the night before and claimed that she had committed a "security violation." During this same conversation, Sheridan told her that he was requesting a doctor's note for the sick leave she had taken on August 28 through August 30, 2006, and advised her that if she did not produce a medical note, her annual leave, instead of her sick leave, would be charged. Later on August 30, 2006, she learned that Estrada instructed employee Chris Tereska that she was to be charged annual leave for her absences from August 28 through August 30, 2006.

As a result of the aforementioned acts of disparate treatment and incidents of harassment constituting a hostile work environment:

21. On August 23, 2006, she advised Estrada and Sheridan that she would be resigning. Later, on August 30, 2006, she informed Estrada that she was resigning effective close of business August 30, 2006.

## DISMISSAL

Complainant also alleged retaliation for reporting an incident to the Department of Commerce Office of Inspector General, *i.e.*, whistleblowing. However, whistleblowing does not fall within the purview of Title VII. The Equal Employment Opportunity Commission has held that whistleblower activities are generally outside the purview of




the EEO process. See *Giannou v. Department of Housing and Urban Development,* EEOC Request No. 05880911 (February 13, 1989) (holding that complainant failed to state a claim regarding claims of retaliation for her whistleblower activity). Therefore, Complainant's basis of retaliation, to the extent it relates to her reporting an incident to the Department of Commerce Office of Inspector General, is dismissed, pursuant to 29 C.F.R. § 1614.107(a)(1) for failure to state a claim.

## Rights and Responsibilities

- If you believe that the issue(s) in your complaint has/have not been correctly identified, the Chief, Program Implementation Division, must be notified at the address shown below, in writing, within 15 calendar days after receipt of this Notice, specifying why you believe that the issue(s) has/have not been correctly identified.

- An investigator will soon contact you to receive your sworn or affirmed statement and the evidence you possess. You and your representative, if represented, will receive a copy of the final Report of Investigation upon its completion.

- The investigation must be completed by March 7, 2007, unless you and the Department agree on an extension. See Title 29, Code of Federal Regulations (C.F.R.) section (§) 1614.108(e) Therefore, it is essential that when the investigator asks you for the information to support your complaint, you or designated representative promptly provide it.

- You may amend your formal complaint at any time before the investigation is complete. See 29 C.F.R. § 1614.106(d). New claims must be like or related to the claims raised in the original complaint. For example, if the original complaint concerns a Performance Improvement Plan, a new claim concerning his/her subsequent performance rating would be "like or related." A new claim concerning his/her time and attendance would not.

- Inasmuch as this is a mixed case, you are not entitled to a hearing. You will receive a Final Agency Decision within 45 days of the date the investigation is completed.

- If a final decision is not issued within 120 days of filing of the mixed case complaint, you may appeal the matter to the MSPB at any time thereafter as specified in 5 C.F.R. § 1201.154(b)(2) or you may file a civil action as specified at 1614.310(g), but not both. See 29 C.F.R. § 1614.302(d)(1)(i).

- We may dismiss the complaint if you fail to cooperate with the investigation.

- If the EEO Officer/Counselor informed you or your designated representative that Alternative Dispute Resolution, through mediation, is an appropriate option in this complaint, you and/or your designated representative, have a right to choose mediation at any time during the

processing of your formal complaint, including during the investigation. (*The DOC EEO Alternative Dispute Resolution: Mediation Guide* identifies the following cases where mediation is inappropriate: cases involving applicants for employment, former employees, alleged violence, egregious harassment, adverse actions, class actions, when authoritative resolution of a matter is required in precedent-setting cases, when the matter in dispute has significant government policy implications, or when it is important to produce a full public record of the proceedings.)

For your information, I have enclosed an information sheet on EEO Complaint Investigations and EEO mediation.

Amendments to formal complaints, copies of hearing requests, and requests for corrections to the statement of claims should be sent to:

> Susan E. Thomas
> Chief, Program Implementation Division
> Office of Civil Rights, Room 6012
> U.S. Department of Commerce
> Washington, D.C. 20230

Requests for mediation and a copy of the ADR Program Guide should be addressed to the servicing EEO Officer or:

> Bernadette M. Worthy
> Chief, Client Services and Resolution Division
> Office of Civil Rights, Room 6012
> U.S. Department of Commerce
> Washington, DC 20230

Sincerely,

*Susan E. Thomas*
Susan E. Thomas
Chief, Program Implementation Division
Office of Civil Rights

Enclosures

ATTACHMENT

8

Exhibit 5 p. 8

17